(No. 43029.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHRIS JOYNER *et al.*, Appellants.

*Opinion filed January 28, 1972.*

WESTBROOKS, HOLMAN & E.F. JOHNSON, and GEORGE C. HOWARD, all of Chicago, for appellants.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (ROBERT A. NOVELLE and THEMIS N. KARNEZIS, Assistant State's Attorneys, of counsel,) for the People.

MR. JUSTICE DAVIS delivered the opinion of the court:

The defendants, Chris Joyner and J. T. Thomas, were indicted for the murders of Anthony Seyl and James C. Starr. They were tried in the circuit court of Cook County and the jury found them guilty of the murder of Starr and not guilty as to Seyl. They were sentenced to the State

Penitentiary for a term of not less than 30 nor more than 60 years.

At about 4:00 A.M., on August 22, 1968, the defendants and three other persons were leaving a drive-in restaurant in a car driven by Joyner. At that time, another car, driven by Starr, in which Seyl was a passenger, was entering the parking lot in the same traffic lane as the Joyner car. The defendants, and the others in their car, were black; Seyl and Starr were white.

There is some dispute as to what transpired. The defendants, and the defense witnesses, testified that Seyl yelled at them in a profane way, to move their car; that Joyner could not back up because another car was behind him; that Seyl then got out of his car, continued his profane language, added racial comments, approached Joyner and stated that "niggers" had no business being there.

As Joyner started to get out of the car, he saw that Seyl was taller and heavier than he, so he kept one foot in the car and they argued. Starr, who was shorter than Seyl, but weighed about 250 pounds, then got out of his car and approached Joyner while using profanity and making similar racial statements, and according to defense witnesses, struck Joyner in the face with a gun. Joyner then pulled a gun out of his belt and shot it in the air. Seyl grabbed him and the two started tussling. Starr also joined in the fracas and, at about this time, Thomas got out of the Joyner car and grabbed Starr's arm. Thomas and Starr then started fighting.

Joyner testified that shortly after he shot into the air, Seyl grabbed his right hand, which held the gun; that while they were fighting, he was thrown to the ground and Seyl was on top of him; that Seyl was holding onto the gun trying to point it toward him (Joyner); and that he was holding the gun tight and it went off twice and Seyl went limp. Joyner further testified that he did not pull the trigger.

Seyl was shot three times, the fatal wound being in the back of his head on the right side. Another bullet inflicted a superficial wound above the right ear, went through the scalp and was not recovered. The third bullet entered the right shoulder.

Thomas and Starr were struggling at the same time. Starr was on top of Thomas, and according to defense witnesses, Starr had the gun in his right hand, and Thomas was holding Starr's right hand with both hands in an effort to keep the gun from being pointed at him. Meanwhile, Starr was hitting Thomas with his left hand.

After Seyl was shot, Joyner ran to the aid of Thomas. He told Starr to get off Thomas and then took hold of Starr and tried to dislodge him. Joyner stated that he grabbed Starr around the shoulder and head with both hands, and was pulling to get him off of Thomas when the gun went off. Starr was shot in the back of the head.

Most of the prosecution witnesses heard six or seven shots. One, a friend or acquaintance of the defendants, testified that he was driving right behind Joyner as they were leaving the restaurant. He heard Seyl and Starr cursing, but apparently heard no racial comments. He saw Starr strike Joyner and the latter pull out his gun. The witness then got out of his car and intended to try to stop the fight. He was about 20 to 25 feet from them. He then saw Thomas get out of the car and thought that Thomas had a gun in his hand, with which he hit Starr. The witness then continued walking around the building toward the restaurant and did not see the parties when the shots were fired, although he heard about six or seven gunshots. One witness testified that he could see Seyl when the shot was fired, and that Seyl was on the pavement with the other individual kneeling over him. He heard the three shots which were fired when the gun was pointed toward Seyl's head.

Another witness testified that she was in a car with her husband and saw the beginning of the incident; that

she saw Starr slap Joyner and that Starr had nothing in his hand. She further testified that she saw Joyner raise his hand and fire the gun in the air; that her husband then pulled her down below the car windows; that she heard scuffling near their car and heard three shots; that one of the bullets apparently hit their car and that shortly thereafter they heard three or four more shots. Her testimony of the statements made by Seyl or Starr did not indicate that they made the racial remarks testified to by the defense witnesses. Her husband substantiated her testimony.

We believe that it is necessary to reverse and remand this case for a new trial. The defendants tendered an instruction setting forth the law relative to voluntary manslaughter. The court refused the instruction. The State contends that the instruction was properly refused in that it was not in conformance with IPI - Criminal No. 7.05. It is true that the tendered instruction was not in conformance with said IPI instruction but should have been. Ill.Rev.Stat. 1969, ch. 110A, par. 451(a).

However, an examination of the record reveals that no instruction was given relative to the law on voluntary manslaughter. Under the facts of this case, the defendants could have been found guilty of manslaughter under the indictments for murder. *People v. Ostrand, 35 Ill.2d 520, 530; People v. Lewis, 375 Ill. 330, 335;* Ill.Rev.Stat. 1967, ch. 38, par. 2—9.

The State does not contend that the facts of this case would permit only a conclusion of murder or not guilty by reason of self-defense. And, in homicide cases, if there is evidence in the record which, if believed by the jury, would reduce the crime to manslaughter, an instruction defining that crime should be given, if requested. *(People v. Jones, 384 Ill. 407, 412; People v. Papas, 381 Ill. 90, 95.)* Occasionally a defendant who raises the defense of self-defense to a charge of murder is convicted of manslaughter. *(People v. Green, 23 Ill.2d 584, 588.)* The

difference between a justified killing under self-defense and one not justified, amounting to voluntary manslaughter, is that in the former instance the belief that the use of force is necessary is reasonable under the circumstances, and in the latter, the belief is unreasonable.

This was a close case factually and it was possible for the jury to find the defendants guilty of murder, not guilty by reason of self-defense, or guilty of manslaughter. The last option should have remained open to the jury and the jury should have been instructed in this regard. IPI - Criminal 7.05 provides: "A person commits the crime of voluntary manslaughter who intentionally or knowingly kills another if, at the time of the killing, he believes that circumstances exist which would justify the killing, but his belief that such circumstances exist is unreasonable." The Committee Note to this instruction states: "When the charge is murder, the defense is self-defense, and the proof supports a voluntary manslaughter instruction and verdict, the order of instruction should be: *first*, Instruction 7.01 (Murder); *second*, this Instruction 7.05; *third*, applicable instruction from Chapter 24—Defenses."

Under the circumstances of this case, the defendants' failure to tender the appropriate IPI instruction was not as important with reference to the fundamental fairness of their trial as the requirement that the jury be fully and properly instructed. The failure to instruct on this important aspect of the case necessitates a remand for a new trial.

The defendants urge several grounds upon which we should enter judgment in this court discharging them. They contend that the verdicts in this case—not guilty of the charge of murder of Seyl and guilty of the charge of murder of Starr—were inconsistent, and, as such, violated their constitutional guarantee against double jeopardy, and they cite *Ashe v. Swenson, 397 U.S. 436, 25 L.Ed.2d 469, 90 S.Ct. 1189.* In *Ashe,* six men were playing poker when three or four masked persons robbed them. The defendant

therein was tried for the robbery of one of the victims. The only issue was the identification of the defendant as one of the robbers. He was found not guilty due to insufficient evidence, and was subsequently tried for the robbery of another of the victims and found guilty. He contended that the verdict of the jury in the first trial constituted a finding that he was not one of the robbers, and that under the doctrine of collateral estoppel that issue could not again be tried.

The Supreme Court agreed and held that collateral estoppel means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot be litigated between the same parties in any future lawsuit, and that the doctrine of collateral estoppel, applicable to criminal proceedings, is also embodied in the fifth-amendment guarantee against double jeopardy. (397 U.S. at 445, 25 L.Ed.2d at 476, 477.) It further held that the finding in the first trial was necessarily that the defendant was not one of the robbers, and the State could not bring the defendant before a new jury to relitigate that issue.

We find that *Ashe* has no application to the case at bar where two offenses—the murder of Starr and the murder of Seyl—were joined for a single prosecution or trial. Thus, there was not, and could not be, a relitigation of an ultimate issue of fact previously determined by a valid final judgment in that the separate crimes were tried in a single proceeding. In such situation, an accused is not compelled to be tried a second time after having been once previously acquitted. It is the identity of the offense, and not the act, which is referred to in the constitutional guaranty against double jeopardy. *People v. Hairston, 46 Ill.2d 348, 356-361; People v. Ciucci, 8 Ill.2d 619, 629, aff'd 356 U.S. 571, 2 L.Ed.2d 983, 78 S.Ct. 839.*

The defendants contend that the two verdicts are inconsistent and cannot stand. In *Hairston,* we noted that logical consistency in verdicts is not necessary so long as

the verdicts are not legally inconsistent. We approved the view that: "In law there is no inconsistency in verdicts of acquittal and conviction upon charges of crimes composed of different elements, but arising out of the same state of facts." (46 Ill.2d 348, 362.) The jury may have concluded that in his struggle with Seyl, Joyner might reasonably have believed that the shooting was necessary to prevent great harm to himself, or that the two men in struggling for the gun caused it to go off. At the same time, the jury might have concluded that in their struggle, Thomas, not Starr, had the gun and that when both Thomas and Joyner were joined in combat with Starr, the same justifications were not present as in Joyner's struggle with Seyl. Such conclusions could be justified by the evidence, and it is not a necessary conclusion that the verdicts are even logically inconsistent.

The defendants contend that the evidence conclusively showed that they acted in self-defense. This defense, however, is somewhat at variance with their testimony. Self-defense relates to the use of force which a person reasonably believes necessary to defend or protect himself. (Ill.Rev.Stat. 1967, ch. 38, par. 7—1.) By its very nature it relates to knowingly and intentionally using force to deter another and not to an accidental shooting. *(People v. Jersky, 377 Ill. 261, 268.)* Yet, Joyner testified that he did not pull the trigger of his gun, except for the first time when he shot into the air. He testified that the shooting of Seyl was the result of the gun going off because he and Seyl were holding it so tight; and as to the shooting of Starr, he testified that he was pulling and shaking Starr at the time the gun went off. Thomas testified that he did not shoot anyone, and that he did not have the gun in his hand, that Starr had it.

It seems clear that Seyl and Starr were the aggressors. Thereafter, however, the evidence is conflicting as to the subsequent altercations and as to who had one of the guns. Whether or not a killing is justified in a given case under

the law of self-defense is ordinarily a difficult determination to make where there are plausible facts which give rise to this defense. The decision is not necessarily less difficult because there are a number of witnesses to the incident.

In view of the fact that this case must be sent back for a new trial, certain of the other contentions raised by the defendants should be discussed.

The defendants contend that the court erred in refusing to suppress as evidence the two guns found by the police. The police arrived as the defendants were leaving the parking lot and blocked their exit. The first officer arrived on the scene quickly because he was in the area and heard the gunshots. When he arrived, people were yelling: "They are the ones that did the shooting." The officer ordered the occupants out of the car and directed them to place their hands on the car roof. When all of the occupants were out of the car and the doors open, he noticed one gun on the floor at the base of the front seat by the driver's side and he confiscated that gun.

Another officer testified that after he had been at the scene for some time he went over to the defendant's car; that Thomas and a girl were then in the back seat; that he ordered them out of the car; that he saw the girl attempt to push her purse up against some photographic equipment in the back seat and that he noticed a shiny object in the purse. After Thomas and the girl were out of the car, he searched the purse and found the chrome-plated revolver with the hammer cocked. He had been told by witnesses that two guns were involved. There were three empty chambers in this gun. Thomas testified that when he got into the car after the fight, he gave the gun in his hand to the girl and told her to put it somewhere.

The seizure of both of the guns was justifiable under the plain view doctrine. Both guns were in open view of the officers and were observed under suspicious circumstances. This did not constitute either a search or an unreasonable seizure. *(People v. Wright, 41 Ill.2d 170, 174;*

*People v. Pickett, 39 Ill.2d 88, 95; People v. McCracken, 30 Ill.2d 425, 429.)* The closer question is relative to the gun found in the purse. The police officer knew there had been a shooting and was told that the defendants had done the shooting. He had been told that there were two guns—only one had been seized at that time—and the officer saw the girl try to hide the purse and saw a shiny object in it. These facts are sufficient to warrant application of the plain view doctrine.

The guns were properly seized under another theory. While the defendants contend that the second gun, at least, was discovered as a result of a search subsequent to the arrest, we believe that the court was justified in believing otherwise. It appears to be a more reasonable conclusion under the evidence that Thomas and the girl got into the back seat of the car after the fight and the second officer then saw the shiny object in her purse and ordered them out of the car. To the extent that there was a search for either of the guns, the search was incidental to an arrest. The fourth amendment proscribes searches incidental to an arrest only if they go beyond the area from which the arrested persons might obtain weapons or evidentiary items. *(Chimel v. California, 395 U.S. 752, 23 L.Ed.2d 685, 89 S.Ct. 2034.)* Under this standard, the search of the entire passenger section of the car was proper.

Totally apart from the right to make a search incidental to the arrest, where there is probable cause for the belief that the contents of a car offend against the law, a warrantless search may be reasonable. The standards applicable to motor vehicles, as opposed to structures, must of necessity be different because of the mobile nature of the former. *Chambers v. Maroney, 399 U.S. 42, 48-50, 26 L.Ed.2d 419, 426, 427, 90 S.Ct. 1975; Carroll v. United States, 267 U.S. 132, 153, 69 L.Ed. 543, 551, 45 S.Ct. 280.*

In *Chambers,* the defendants were arrested and the car involved was removed to the police station. The car was

then thoroughly searched, without a warrant. In holding that the search did not violate protection afforded by the fourth amendment, the court said that the car in that case could have been searched on the street where it was stopped. There was probable cause for such a search, and this cause continued and still obtained at the police station. The court noted that the mobility of the car remained in that the car itself could not be seized without a warrant. The car could have been removed by someone. Under such circumstances, " *** there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." (399 U.S. 42, 52, 26 L.Ed.2d 419, 429, 90 S.Ct. 1975.) If there is probable cause to search a car, there is no constitutional difference between seizing and holding it before presenting probable cause to a magistrate to obtain a search warrant, and permitting an immediate search at the station or garage. Also see: *Cooper v. California, 386 U.S. 58, 17 L.Ed.2d 730, 87 S.Ct. 788; People v. Pickett, 39 Ill.2d 88, 92, 93; People v. Ricketson, 129 Ill.App.2d 365, 374.*

We believe that the foregoing authorities also justify the search and seizure of the bullets from the glove compartment. It is true that it is not clear whether the glove compartment was searched at the scene of the arrest, on the way to, or at the police station or garage. Under the circumstances of this case, we believe there was no unreasonable search or seizure in any of those events.

The defendants further complain that the brother of Joyner, also a passenger in the car on the night in question, was improperly impeached by a statement taken without constitutional warnings having been given to him of his right to be silent and his right to counsel. The record appears to refute the contention that he was not given such warnings. Further, we have held that the constitutional rights to be protected by the warnings are personal

and may not be relied upon by others to bar the use of such statements. *People v. Denham, 41 Ill.2d 1, 4.*

The defendants set forth thirty instances in which they claim the trial court committed error in the conduct of the trial. We find but few errors in the conduct of the trial and cannot agree that the trial was conducted in a manner unfair to the defendants. Likewise, we believe that the defendants' numerous complaints with regard to the giving and refusing of instructions will be eliminated by use of IPI instructions.

For the reasons stated herein, the judgments of conviction are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*