THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TIMOTHY CHITWOOD *et al.*, Defendants.—(TIMOTHY WARREN CHITWOOD, Defendant-Appellant.)—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* TIMOTHY CHITWOOD *et al.*, Defendants.—(GARY WAYNE TOOLATE, Defendant-Appellant.)

Fourth District   Nos. 12909-10 cons.

Opinion filed March 25, 1976.

Richard J. Wilson and John L. Swartz, both of State Appellate Defender's Office, of Springfield, for appellants.

Robert J. Bier, State's Attorney, of Quincy (G. Michael Prall, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

Defendants Timothy Chitwood and Gary Toolate were indicted by the grand jury of Adams County for burglaries of Lincoln School and Senior High School 1 in Quincy, Illinois, which occurred on the night of January 1, 1974. The State chose to proceed on the Lincoln School burglary, and after a joint trial, a jury found both defendants guilty of that burglary. The counts of the indictment charging them with the burglary of Quincy Senior High 1 were then dismissed. Defendant Chitwood received a sentence of 4 to 12 years, and defendant Toolate received a sentence of 3 to 9 years. They both appeal their convictions.

On appeal defendants contend that the trial court committed reversible error in (1) declaring Linda Nunn a court's witness and (2) allowing the State to impeach her by prior inconsistent statements in which she had related purported admissions by the defendants. In order to consider these contentions it is necessary to review the evidence adduced at the trial.

The custodian of Lincoln School testified that when he arrived at work at 7:30 a.m. on January 2, 1974, he discovered that the school, which is located at 48th and Maine, had been broken into. He also found two sets of footprints in the snow near the west side of the school building. Money and an Accousti-corder tape recorder were missing.

The principal of Senior High School 1 testified over defendants' objections that the high school, which is located at 30th and Maine, had been burglarized on the same night as Lincoln School. Vending machines had been opened, and a small Motorola cassette tape recorder was missing. It appeared that entry had been made through the shop in the back of the building. Footprints were found in the snow leading away from the building to 36th Street.

A cabdriver testified that about 11:15 p.m. on January 1 he had picked up three young men at 11th and Hampshire and taken them to 30th and Vermont. He identified defendant Chitwood as one of the men, but could not identify the other two. They told him they were going to a party. A second cabdriver testified that between 2 and 3 a.m. on January 2 he had picked up defendant Toolate and some other people at 29th and Broadway. He took them somewhere near 12th and Hampshire.

A secretary at Lincoln School testified that People's Exhibit No. 1 was the same type of tape recorder that had been taken from the school. She

also testified that there were very few similar models in town. The school had tried to replace the missing recorder, but another one like it could not be found.

Linda Nunn was called as a chief witness for the prosecution. On the date set for trial, she did not appear. The State requested either a continuance until the witness could be located or a stipulation of the substance of her testimony. The State's attorney stated that he had information that Linda Nunn was pregnant, that the father of the child was defendant Chitwood, and that Ms. Nunn was trying to avoid appearing as a witness. Defense counsel refused to stipulate to the testimony of the proposed witness, noting that their understanding of the substance of her testimony differed markedly from the State's representations of what her testimony would be. They also stated that the witness was available and that they would try to contact her. Ms. Nunn finally appeared after the jury was selected.

She testified that she had known defendant Chitwood since October 1973 and defendant Toolate for about two years. David Snyder, who had pled guilty to the burglary at the high school, was her nephew. At the time of the offense she, Snyder, Toolate, and Chitwood were all residing at Chitwood's house at 1228 Hampshire in Quincy. She had been living with Chitwood since December 1973.

She testified that Chitwood, Toolate, and Snyder had left the house separately at different times on the evening of January 1 and had returned together at about 2:30 or 2:45 a.m. She did not have any conversation with them when they returned; she was in bed. When she got up the next morning she saw a sack of articles on the living room floor, including a tape recorder. She identified People's Exhibit No. 1 as being similar to a tape recorder Chitwood had had prior to the burglary. The tape recorder she had seen on the living room floor the morning after the burglary had been different.

She also testified that the defendants said that they had gone to Harlow's coffee shop the night before. David Snyder told her that he had been at the Lincoln School and at the high school, but he did not tell her anything about what he had done there or who he was with. She stated that neither Chitwood nor Toolate had mentioned anything to her about the burglaries at the two schools. At that point the State's attorney asked her if she recalled having a conversation with Detective Harold Lamb of the Quincy Police Department on February 13, 1974. She stated that she did remember the conversation, whereupon defense counsel objected that the State was trying to impeach its own witness and asked for a hearing outside the presence of the jury. The State's attorney then stated that he intended to claim surprise at the testimony of the witness and that he wished to refresh her recollection through the use of prior inconsistent

statements. The court reserved ruling pending further examination to refresh the witness' recollection. In answer to further questions by the prosecutor, Ms. Nunn admitted making a statement about the burglaries to Detective Lamb on February 13, 1974, in the presence of a secretary. The questioning then continued as follows:

> "Q. And do you recall him asking you, 'Did they admit or talk about the burglary in your presence?' and you answered, 'They talked about Senior High 1, the night they robbed Lincoln School, and they said they got Lincoln School the same night they got Senior High 1.' Do you recall that incident?"

At that point defense counsel renewed their objections and the court granted a hearing outside the presence of the jury.

In response to questioning by the prosecutor, Ms. Nunn stated that she had lied to Detective Lamb and had lied the previous day when she had made a similar statement to the State's attorney. She said she had lied to get Chitwood and Toolate in trouble after Chitwood broke up with her. She also said that she had gone to the defendants' lawyers and told them the truth. She denied that she had told David Snyder that she was going to change her story to protect Chitwood. The State then requested leave to impeach Ms. Nunn as a hostile witness under Supreme Court Rule 238 by use of prior inconsistent statements. (Ill. Rev. Stat. 1973, ch. 110A, par. 238.) Defendants objected on the ground that there had not been a sufficient showing of hostility, but the court stated that it had found the witness to be hostile and declared her a court's witness.

After the jury was returned the court stated that Ms. Nunn had been declared a court's witness, and the State was allowed to continue its questioning about her prior inconsistent statements. She admitted that she had discussed defendants' participation in the burglaries with Detective Lamb on February 13 and that in response to the question, "Did they admit or talk about the burglary in your presence?" she had answered, "They talked about Senior High 1, the night they robbed Lincoln School, and they said they got Lincoln the same night they got Senior High 1." She testified, however, that her statement to Detective Lamb had been a lie. She also admitted telling the State's attorney the same story the day before she was to testify at trial, but stated that once again she had been lying.

Ms. Nunn was then cross-examined by the defense about her previous statements. She testified that she had given the false statements to the police and the State's attorney in order to get even with Chitwood for breaking up with her. She got the knowledge about the burglaries from David Snyder, who had told her about his participation in them. The police had contacted her about something else and she had mentioned the burglaries to them. She later lied to the State's attorney because she was scared.

She also recalled that Snyder had left the house at about 2 p.m. on January 1. Chitwood had gone out for a drink at about 9:30 p.m. and had returned at about 10 o'clock. Gary Toolate was in the house all evening. She went to sleep around midnight. She was awakened at about 2 a.m. because Chitwood got up. He had noticed that Toolate was gone and asked her where he was. She told him that Toolate had said that he might go to Harlow's coffee shop for a cup of coffee. Chitwood said that he was going to Harlow's to see if Toolate was there and left the house. She testified that Chitwood often got up in the middle of the night and went out for coffee. She thought he left on foot because nobody in the house had a car in operating condition. He returned about 45 minutes later with Toolate and Snyder. Chitwood went right to bed.

Upon further examination by the State Ms. Nunn testified that Jack Burton, a juvenile court officer, had asked to talk to her some time after she had broken up with Chitwood. She admitted that she had told him that a tape recorder taken at the burglary of a local school was at Chitwood's house.

Jack Burton then testified for the prosecution that Ms. Nunn had called him and asked him to meet her on January 30, 1974. After talking to her he went to Chitwood's house, which was then vacant, and found a tape recorder, which he identified as People's Exhibit No. 1.

David Snyder was also called as a prosecution witness. He testified that he, Toolate, and Chitwood left Chitwood's house at about 11 on the night of January 1 and went to a tavern at 11th and Hampshire. Later the three of them left the tavern in a cab and went to 30th and Maine. They walked around behind the high school and went in through the shop. They ransacked the offices looking for money and took a tape recorder. They then left the building the same way they came in and walked to Lincoln School. They left the tape recorder at about 36th and Maine. Chitwood and Toolate broke into Lincoln School, but Snyder was "chicken" and did not go inside. When the others came back out, they all walked back to 30th and called a cab from an outdoor phone booth near Harlow's. Harlow's was closed. On the way to Harlow's they had picked up the tape recorder taken from the high school. Snyder found a pizza box and put that tape recorder and some other things in it. They took the cab back to Chitwood's house. Snyder identified People's Exhibit No. 1 as one of the items taken in the burglaries.

On cross-examination Snyder denied that he had told Linda Nunn that he would do anything to get Chitwood and Toolate into trouble. He admitted that he had pled guilty to a misdemeanor in connection with the breakin at the high school and that he had received a sentence of probation.

Linda Nunn was called as a witness by the defense and again testified as a court's witness. She stated that Snyder had told her several times in

telephone conversations that he would do anything to get Chitwood and Toolate into trouble. On cross-examination by the State, however, she admitted that she had initiated the calls to Snyder.

Defendant Chitwood testified that he had left his house at about 9:30 p.m. and gone to a tavern for a beer. When he returned home at about 10, Toolate was listening to the stereo and Linda Nunn was somewhere else in the house. He and Ms. Nunn went to sleep at about 12. Some time later he awoke and noticed that Toolate was gone. Ms. Nunn told him that Toolate had said he might go to Harlow's. Chitwood got dressed and walked to Harlow's. He met Toolate there and had coffee. There were other customers in the coffee shop. They called a cab to take them home from outside Harlow's. David Snyder came along carrying a cardboard box, and they gave him a ride home. Chitwood went right to bed when they got home. He identified People's Exhibit No. 1 as a tape recorder given to him by his mother 2 or 3 years before. He testified that some time after the date of the burglary, he had gotten tired of having Snyder around and told him to get out of his house. He also testified that Linda Nunn had been angry with him for dating other girls.

Defendant Toolate testified that he had left Chitwood's house at about 1:30 a.m. and walked to Harlow's for a cup of coffee. Chitwood came in a few minutes later. After a while they called a cab from outside of the coffee shop to take them home. Snyder came by carrying a cardboard box and rode home with them. Toolate went right to bed when they got home.

A waitress at the coffee shop testified as a rebuttal witness for the State that the coffee shop, which is normally open 24 hours a day, is closed on certain holidays including New Year's Day. The shop was closed on January 1, 1974, and did not reopen until approximately 3:15 a.m. on January 2, 1974. She did not have many customers that morning, and it was at least 15 or 20 minutes before the first customer came in. She was acquainted with Toolate but could not remember seeing him that morning although he and his friends often came into the coffee shop after midnight. She also stated that there was a public telephone inside the coffee shop.

■■ We first consider defendants' contention that the calling of Linda Nunn as a court's witness was unjustified. The effect of declaring a witness a court's witness is to open the witness to cross-examination and impeachment by either side. In *People v. Moriarity*, 33 Ill. 2d 606, 213 N.E.2d 516, the Supreme Court reviewed the standards which have been applied to the calling of court's witnesses:

"The practice of the court's calling a witness at the request of the prosecution in a criminal case was first enunciated in *Carle v. People*, 200 Ill. 494, where the court approved the calling of an eyewitness to a crime for whose veracity the State's Attorney could not

vouch. It was later stated in *People v. Cardinelli*, 297 Ill. 116, that the purpose of the practice was to prevent a miscarriage of justice by having an eyewitness to a crime, for whose veracity neither party will vouch, fail to testify. And while subsequent decisions have held that the practice is not limited to the calling of eyewitnesses, (*People v. Touhy*, 361 Ill. 332, 350; *People v. Siciliano*, 4 Ill. 2d 581, 590,) every decision which has touched upon the subject has counseled that the practice should be sparingly used and restricted to cases where it is shown there might otherwise be a miscarriage of justice. (*People v. Johnson*, 333 Ill. 469; *People v. Laster*, 413 Ill. 224; *People v. Bennett*, 413 Ill. 601; *People v. Robinson*, 14 Ill. 2d 325). Further, as indicated in *People v. Siciliano*, 4 Ill. 2d 581, 590, a proper foundation must be laid for the calling of a court's witness, which would necessarily consist of the reasons why the party desiring the witness cannot vouch for his veracity, and showing that the testimony of the witness will relate to direct issues and is necessary to prevent a miscarriage of justice. See also: *People v. Touhy*, 361 Ill. 332, 349; *People v. Johnson*, 333 Ill. 469, 473." 33 Ill. 2d 606, 615, 213 N.E.2d 516, 521.

The question raised by defendants in the instant case is whether a proper foundation was laid to support the calling of Ms. Nunn as a court's witness. There appears to have been some confusion at the trial between the practice of calling a witness as a court's witness and Supreme Court Rule 238 (Ill. Rev. Stat. 1973, ch. 110A, par. 238), which is concerned with the examination of hostile witnesses. The prosecutor requested that Ms. Nunn be called as a hostile witness but the trial court declared her a court's witness. Rule 238 provides that a witness may be cross-examined by the party calling him upon a showing of hostility. The Rule further states, however, that a hostile *occurrence* witness may be impeached by prior inconsistent statements if there is an additional showing of surprise by the party calling him. The language of Rule 238 thus appears to limit impeachment of hostile witnesses by prior inconsistent statements to occurrence witnesses. We therefore note in passing that had Ms. Nunn been declared a hostile witness rather than a court's witness, the prosecution could not have impeached her by prior inconsistent statements because she was not an occurrence witness.

Although the State sought to have Ms. Nunn declared a hostile witness and its efforts were aimed at showing hostility and surprise, we must consider whether there was nevertheless a sufficient basis for declaring her a court's witness. As the portion of the *Moriarity* opinion quoted above states, a proper foundation for the calling of a court's witness consists of the "reasons why the party desiring the witness cannot vouch for his veracity" and a "showing that the testimony of the witness will relate to di-

rect issues and is necessary to prevent a miscarriage of justice." Ms. Nunn testified at the hearing out of presence of the jury that she had lied in all of her previous statements to the prosecution, the last of which were made as late as the day before she was to appear as a witness. Thus, while offered to show hostility and surprise, her testimony also clearly indicated that the State could not vouch for her veracity.

■■ A more difficult question is whether there was sufficient showing that the witness' testimony would relate to direct issues in the case and would be necessary to prevent a miscarriage of justice. Although the prosecutor appeared most concerned with Ms. Nunn's testimony about defendants' purported admissions, some of her testimony before being declared a court's witness concerned matters such as the identity of a tape recorder she had seen in Chitwood's living room the day after the burglary and the activities of the defendants on the night of the burglary. These matters, about which Ms. Nunn appeared to have significant knowledge unavailable to anyone but defendants and David Snyder, related to direct issues in the case. We conclude that there was a sufficient foundation for calling Ms. Nunn as a court's witness to testify about such matters. However, the prosecutor's examination of the court's witness was not limited to those matters, and this leads us to consideration of defendants' second contention. By being permitted to impeach Ms. Nunn by prior inconsistent statements, the State was able to put before the jury evidence that defendants had made admissions of guilt. Defendants contend that this use of the court's witness' prior inconsistent statements was so prejudicial as to constitute reversible error.

As Professor Cleary indicates, the courts have condemned the use of the court's witness rule "merely as a device for placing before the jury a prior statement under the guise of impeachment. *People v. Johnson*, 333 Ill. 469, 165 N.E. 235 (1929)." (Cleary, Handbook of Illinois Evidence §6.9 (2d ed. 1963).) The court in *Johnson* reviewed the evidence in that case and found that the court's witness' testimony in chief had included nothing tending to show defendant's guilt or innocence and that there was nothing to cross-examine her about. The court then concluded that since there was nothing to impeach, the only object of impeaching her with a prior inconsistent statement was to get the statement before the jury. The notion that witnesses may be impeached by prior inconsistent statements only if their testimony is damaging to the examiner's case is explained in McCormick as:

> "* * * the view that if a party interrogates a witness about a fact which would be favorable to the examiner if true, and receives a reply which is merely negative in its effect on examiner's case, the examiner may not by extrinsic evidence prove that the first witness had earlier stated that the fact was true as desired by the inquirer.

An affirmative answer would have been material and subject to be impeached by an inconsistent statement, but a negative answer is not damaging to the examiner, but merely disappointing, and may not be thus impeached. In this situation the policy involved is * * * the protection of the other party against the hearsay use by the jury of the previous statement." (McCormick, Evidence §36 (2d ed. 1972) (footnotes omitted).)

In the instant case, Ms. Nunn's denial that she had heard defendants admit the burglary was merely disappointing to the examiner's case and not damaging since the prosecution was no worse off than if she had not testified. Thus, there was nothing to impeach in this testimony. On the other hand, her testimony that the tape recorder introduced into evidence by the State had been in Chitwood's possession before the burglary was damaging to the prosecution, and it was proper to allow her testimony on this subject to be impeached by prior inconsistent statements. However, due to the highly incriminating nature of the admissions and their only collateral relationship to the issue of the identity of the tape recorder, it was improper to allow her prior inconsistent statements about the admissions to be used to impeach her testimony about the tape recorder.

Because a court's witness has already been demonstrated to be unreliable before being impeached, the danger of prejudice is compounded. An early case addressing itself to this problem is *People v. Grigsby*, 357 Ill. 141, 191 N.E. 264. It involved a witness who was called by the prosecution for the purpose of proving that the defendant had come to her home late on the night of the shooting in question and told her he had shot some people. After a few questions it became apparent that her testimony would be unsatisfactory to the prosecution, and upon request of the prosecution, she was declared a court's witness. The prosecutor was then allowed to ask her a long series of questions about her prior statement to the State's attorney and a stenographer, including the question, "And were you not further asked what else he said, and if you didn't reply that he said that he had shot a couple of guys?" to which the witness replied, "Yes, sir." (357 Ill. 141, 145, 191 N.E. 264, 266.) In holding that impeachment of the court's witness by the prior statement was prejudicial error, the court said:

"If the witness admitted making the previous statement, it would prove nothing except that he, an admittedly unreliable witness, had said so. If the witness denied making the statement the matter would necessarily end there, because to pursue it further would be trying a collateral issue rather than a fact material under the indictment. The defendant would thus be hopelessly enmeshed in a prejudicial situation without anyone having assumed responsibility or liability for perjury." 357 Ill. 141, 149, 191 N.E. 264, 268.

In the instant case, Ms. Nunn, an admittedly unreliable witness, acknowledged making a previous statement in which she had said that defendants had told her that they committed the burglary. Although the witness' acknowledgment of the prior statement proved nothing about defendants' guilt or innocence, evidence of admissions of guilt by the defendants was put before the jury.

The Supreme Court has repeatedly refused to depart from the traditional rule that prior inconsistent statements may be used solely to determine credibility and may not be considered as substantive evidence. *People v. Collins*, 49 Ill. 2d 179, 274 N.E.2d 77; *People v. Powell*, 53 Ill. 2d 465, 292 N.E.2d 409; *People v. Gant*, 58 Ill. 2d 178, 317 N.E.2d 564.

In *People v. Bailey*, 60 Ill. 2d 37, 322 N.E.2d 804, the majority held that reversible error occurred despite the trial court's cautionary instructions because of the State's emphasis on the substantive content of a court's witness' prior inconsistent statements implicating the defendant. In *Bailey* at the time the court's witness testified, the trial court informed the jury that

> ' "\* \* \* It is proper to impeach or discredit a witness by proving statements made by such witnesses at some other time and place, different from the testimony in this case on trial, still any statement that any witness may have made at such other time and place is not to be considered by you as any evidence as to the guilt or innocence of the defendant or any of them. Evidence that on some former occasion a witness made a statement different from or inconsistent with his testimony in this case should only be considered by you in deciding the weight to be given to that witness." ' (60 Ill. 2d 37, 41, 322 N.E.2d 804, 807.)

The *Bailey* opinion also indicates that at the close of the case the trial court instructed the jury as it had previously concerning the use of prior inconsistent statements.

■■ In the instant case, at the time Ms. Nunn was testifying as a court's witness nothing was said to the jury to indicate that her prior statements were being admitted for a limited purpose and could not be considered as substantive evidence. At the request of the State at the conclusion of the case the jury was given IPI Criminal Instruction No. 3.11, which states:

> "Evidence that on some former occasion a witness made a statement inconsistent with his testimony in this case, may be considered by you in deciding the weight to be given to the testimony of that witness."

Even this instruction did not tell the jury that the evidence was to be considered only for purposes of impeachment. While the defendant had the responsibility to have the jury informed of the limited consideration to be given to the evidence, there is nothing in the procedure followed which

mitigated the prejudice to defendants arising from receipt of the evidence. Even advocates of a narrow reading of the line of cases culminating in *Bailey* agree that impeachment of a court's witness by prior inconsistent statements which bear directly on a defendant's guilt or innocence is permissible only when the State makes no attempt to impart substantive value to the prior statements and the jury is informed and instructed that the statements are not to be considered as substantive evidence. See *People v. Bailey*, 60 Ill. 2d 37, 49-59, 322 N.E.2d 804, 811-16 (Underwood, C.J., and Ryan, J., dissenting).

■■ Because here the State was allowed to impeach the court's witness by highly prejudicial prior statements that the defendants had admitted their guilt to her when there was no justification for impeaching the witness on this point and because the jury was never informed that the statements could not be considered as substantive evidence, we must conclude that the impeachment of the court's witness constituted reversible error under the standards of both the majority and the dissent in *Bailey*. Accordingly, the judgments against both defendants are reversed and the cause remanded for a new trial.

Reversed and remanded.

TRAPP, P.J., and CRAVEN, J., concur.