(No. 54413.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. PAMELA PASTORINO, Appellee.

*Opinion filed February 19, 1982.—Rehearing
denied April 16, 1982.*

GOLDENHERSH and SIMON, JJ., dissenting.

Tyrone Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Melbourne A. Noel, Jr., and Mark L. Rotert, Assistant Attorneys General, of Chicago, and Marcia B. Orr, Richard R. Burke, and Michael E. Shabat, Assistant State's

Attorneys, of counsel), for the People.

Bradley Harris, of North Riverside, for appellee.

JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant, Pamela Pastorino, and her 14-year-old sister, Debbie Saylor, were charged with the November 19, 1977, murder of their stepfather, Leonard Warchol. Prior to defendant's trial, Debbie had been adjudicated a delinquent based upon the same conduct and, at the time of trial, was in the custody of juvenile authorities. A Cook County jury found defendant guilty of murder and aggravated battery and not guilty of voluntary manslaughter; she was sentenced to imprisonment for not less than 20 nor more than 60 years. The appellate court reversed because of improper jury instructions and remanded for a new trial. (90 Ill. App. 3d 921.) We granted the State's petition for leave to appeal.

The medical examiner testified that Leonard Warchol had received 6 stab wounds and about 20 head wounds caused by a blunt object. Death resulted from "[s]tab wounds of the chest with involvement of the lungs in association with cranial injury." His body was found by investigating officers in the bathtub, although physical evidence and testimony indicates that he was killed in the living room of his home. Two pieces of pipe were recovered at the scene; one bore traces of blood and hair which matched samples taken from the victim. The medical examiner testified that the head injuries were consistent with being caused by this pipe. A butcher knife was recovered several weeks later from the kitchen of Warchol's home after Debbie Saylor identified it to police as the murder weapon. Neither the knife nor the pipe bore fingerprints. The knife was clean when recovered; testimony suggests that it is normally difficult to get fingerprints from substances with the texture of the pipe.

The State called defendant's brother, Earl "Danny" Saylor, who agreed to testify only after he was granted immunity. He informed the court, before his testimony, that he would, in part, contradict a previously given unsworn statement. When he did so during his testimony, the trial judge made him a court's witness. He then testified that he talked to the defendant and Debbie a few hours after the murder at defendant's home. Debbie was living with defendant at this time. During that conversation Debbie told him that the killing followed an argument over pizza between Debbie and her stepfather. She told her brother that she was tired of fighting over "little stuff"; that she had stabbed him; that defendant hit him with a pipe; and that they both had worn gloves. Defendant was present when Debbie told this story to her brother, but said nothing. The State attempted to impeach this testimony with Saylor's prior statement in which he said that defendant had said that she hit her stepfather with the pipe and had worn gloves. On cross-examination by defendant Saylor said that he was under the influence of marijuana and alcohol when he made those statements to police and when he talked to his sisters on November 19. The State later called the assistant State's Attorney who had taken Danny Saylor's statement. He testified that Saylor was coherent and his answers were "responsive" when he gave that statement.

Debbie Saylor was called as a witness for the State. She was represented by counsel who informed the court that Debbie would refuse to testify. Debbie was sworn, with the jury not present, and she invoked her fifth amendment privilege. The State granted immunity but she still refused to testify. The court admonished her that she would be sentenced for contempt if she did not purge herself before the end of the trial and ordered that she be brought to court each day.

Danny Minigh, a friend of Danny Saylor, as well as defendant and Debbie, testified that some months before

the murder defendant had asked him if he knew anyone who would want to make $500 for "bumping Lennie off." Minigh said he told her she was "crazy" and the matter was dropped. He said that he had also spoken with defendant and her sister at defendant's home, after the murder but apparently before Danny Saylor arrived. Defendant told him that "Lennie had jumped into Debbie about making a pizza and that she [defendant] had struck him with a pipe and that Debbie had stabbed him, and that she was trying to stop Debbie from stabbing him, and Debbie stabbed her in the finger with the knife." Defendant also told him that they had disposed of the pipe and the "gloves and stuff." Minigh testified that when, at the wake of Leonard Warchol, he asked defendant where she hit him, she replied, "In the head." On cross-examination, Minigh testified that he was on probation from a robbery conviction and had other charges pending against him. He had been "seeing" defendant some time before the murder. He also said that he had learned that defendant's mother [Leonard Warchol's wife] had been treated in the hospital, on November 19, for injuries.

The following day, after Minigh's testimony, Debbie Saylor was brought before the court and she again refused to testify. At this time the State asked that this refusal be made before the jury. The court allowed the motion over objection, and she was sworn. She admitted to being defendant's sister but refused to testify further. Later that afternoon the State rested, and defendant rested without presenting evidence. Closing arguments were set for the following morning.

Before the arguments Debbie Saylor told the court that she would testify. Both the State and the defendant objected. The thrust of the State's objection was that it was satisfied with its case and it could not vouch for Debbie's testimony. Furthermore the State seemed to view Debbie's

late compliance with the court's order as a ploy to avoid contempt proceedings. The court, however, noting that she was an occurrence witness, reopened the case and, "for the sake of justice," called her as a court's witness. The court stated that both the State and the defendant could cross-examine her and that both sides could present further evidence after her testimony.

Debbie then testified that she stabbed Leonard Warchol as he sat watching TV. She said she thought the defendant was "downstairs" at the time. She said that she did not know if defendant hit him, that she was not wearing gloves, and that she had not told Danny Saylor or Minigh anything that night. The State attempted to impeach with a signed statement she had given to police by reading several questions and answers from it. She admitted to making the statement. In it she had said that she had told both Minigh and her brother about the murder, that when she and defendant arrived at Warchol's home they first went to the basement and when they came up she got a knife from the kitchen and began stabbing him; and that defendant then hit him with the pipe. During cross-examination by defendant, Debbie said that when she went to the basement she hit her mother, knocking her to the floor. She also said she did not remember that either she or her sister hit Leonard Warchol with a pipe.

Defendant then testified in her own behalf. She said that she was downstairs talking to her mother when she heard a loud argument between Debbie and her stepfather upstairs. Debbie then came downstairs and hit her mother, crying that she would "kill Lennie." She said that after checking on her mother, who was unconscious, she followed her sister upstairs. She saw Debbie stabbing Leonard and attempted to stop her, being stabbed in her finger while doing so. She said she did not hit him with a pipe nor did she see her sister do so. On cross-examination she denied

wearing gloves, denied hitting Warchol, denied soliciting Minigh for his murder, and denied admitting to Minigh or her brother that she had hit him.

Defendant alleges that the trial court erred in instructing the jury to consider the murder verdict before the manslaughter verdict and in declining to instruct the jury on voluntary manslaughter resulting from an unreasonable belief that the use of force was justified; that the trial court overstepped the bounds of neutrality by calling two court's witnesses, by reopening the trial after both sides had rested, and by putting Debbie Saylor in front of the jury when the court knew she would refuse to testify; and that the State imparted substantive character to the prior inconsistent statements of Danny and Debbie Saylor.

During the instruction conference, defense counsel requested that the jury be told it could not return a guilty verdict on both murder and voluntary manslaughter. The court read standard Illinois Pattern Jury Instructions to the jury, including those on accountability, aggravated battery, voluntary manslaughter by acting under intense passion from serious provocation, and murder. After giving these instructions the court made some additional comments, including:

"I will go back and explain this to you in a very slow manner so you won't get confused. Since you have the initial charge, which is a charge of murder, there are also two other crimes that we call lesser and included offenses of them. One is aggravated battery. So, you have two possible verdicts on aggravated battery. In other words, she did commit the aggravated battery or did not commit the aggravated battery. So, you will come back with one verdict as far as the aggravated battery is concerned. In other words, on the aggravated battery she will either be guilty or not guilty. You will come back with one of the two aggravated batteries filled out. Do you all understand that?

As far as the other four are concerned, you have a voluntary manslaughter and you have a murder. An individual cannot be guilty of both of them, so what you will have to do is consider the murder verdict. When you have reached your verdict as far as the murder is concerned, it's either guilty or not guilty. If you find the defendant not— guilty of murder, you may— you do not have to do anything else. If you find her guilty of murder, then you don't have to consider the voluntary manslaughter because you have already found her guilty of murder. So, you will come back just with the guilty of murder filled out.

If you find her not guilty of murder, then you will consider the voluntary manslaughter. If you consider the voluntary manslaughter, then you will have to come back with guilty of voluntary manslaughter or not guilty of voluntary manslaughter. In other words, you may come back with two verdicts filled out or three verdicts filled out.

You must come back with one verdict on the aggravated battery. Now, between the murder count, if you find her guilty of murder, then you do not consider voluntary manslaughter. And if you find her not guilty of murder, then you must consider voluntary manslaughter, guilty or not guilty.

Did I confuse you, or do you understand that?

All right. During the course of deliberations, if you get a little confused on it, send a note out to the deputy that you need clarification, That's basically what it is. Okay. You come back either with two verdicts filled out or three verdicts. If you find her not guilty on everything, of course you come back with three. If you find her guilty or not guilty on the aggravated battery, of course not guilty or guilty on the murder. Of course, if you find her guilty of murder, then you do not consider voluntary manslaughter. Okay."

The appellate court held that these comments constituted plain error, despite the lack of objection by defend-

ant, and remanded for a new trial because "the situation here is analogous to one in which the judge failed to instruct the jury on voluntary manslaughter. The judge's comments had the effect of taking away from the jury the necessary element of choice of deemphasizing the importance of the manslaughter verdict. The defendant was therefore deprived of her right to have the jury choose between murder and voluntary manslaughter where there was evidence in the record supporting both verdicts." (90 Ill. App. 3d 921, 925.) We disagree with the holding of the appellate court and find that the alleged error has been waived. Plain error is a narrow and limited exception to the general waiver rule. (*People v. Roberts* (1979), 75 Ill. 2d 1, 14-15; *People v. Underwood* (1978), 72 Ill. 2d 124, 129-30; *cf. People v. Pickett* (1973), 54 Ill. 2d 280, 283 (review of alleged error where evidence is closely balanced).) We note that defendant's counsel asked that the jury be instructed that guilty verdicts could not be returned on both murder and manslaughter. By failing to object at the proper time to the comments made in compliance with counsel's request, the trial judge was deprived of an opportunity to clarify those remarks and correct any error he may have made. (*People v. Roberts* (1979), 75 Ill. 2d 1; *cf. People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180-81; *Morello v. People* (1907), 226 Ill. 388, 397-98.) In *Roberts* we stated: "The reason for this waiver rule, as stated in many of our appellate court cases, is that timely objections to defective instructions permit the court to correct the defects before the instructions are given, and do not therefore permit a party failing to object to gain the advantage of obtaining a reversal based upon his own failure to act." (75 Ill. 2d 1, 11.) Had the objection now urged been made at the time the instruction was given, it is clear that the trial judge could have rephrased his comments to eliminate or diminish the effect which defendant now alleges was prejudicial to her.

The evidence is not so closely balanced in this case as to

prompt us to look past the lack of objection. (See *People v. Williams* (1981), 87 Ill. 2d 161; *People v. Roberts* (1979), 75 Ill. 2d 1; *People v. Pickett* (1973), 54 Ill. 2d 280; *People v. Joyner* (1972), 50 Ill. 2d 302.) The jury was instructed that voluntary manslaughter was committed if defendant killed "under a sudden and intense passion resulting from serious provocation by the deceased" (Illinois Pattern Jury Instructions, Criminal Nos. 7.03, 7.04 (1968)) as requested by defendant. We note however that there was little, if any, evidence to support a finding of serious provocation or of conduct justifying the use of force. According to the testimony of both defendant and her sister the argument that occurred before the murder was between Debbie and her stepfather. Defendant was not present. There was no evidence to suggest that Leonard Warchol in any way provoked the defendant. There was substantial evidence that defendant committed murder in the admissions made by defendant to her brother and Danny Minigh. On these facts we believe that no error so substantial as to deprive defendant of a fair trial has occurred. *People v. Roberts* (1979), 75 Ill. 2d 1, 14-15; *cf. People v. Joyner* (1972), 50 Ill. 2d 302; *People v. Burson* (1957), 11 Ill. 2d 360.

Nor do we find that defendant was entitled to an instruction on voluntary manslaughter resulting from an unreasonable belief that the use of force was justifiable. The appellate court indicated that such instruction was warranted because Danny Minigh testified that he was told by defendant that "Lennie had jumped into Debbie about making a pizza." The trial court thought this was insufficient evidence to support the instruction, and we agree. We note that later testimony established that defendant was not present during the argument, and by defendant's own testimony the argument consisted of "loud talking." There was no evidence that Leonard Warchol was combative, aggressive, or took any actions directed against defendant or her sister. (See *People v. Leonard* (1980), 83 Ill. 2d 411,

419-23; *People v. Lockett* (1980), 82 Ill. 2d 546, 549-52.) While Debbie had testified that her stepfather had beaten and raped her on some earlier occasion, she also admitted that she had told no one of this until she spoke with a psychiatrist at the Department of Corrections Youth Center. She said her attorney knew this, too, but did not bring it up in the juvenile hearing because she did not want him to. Since the record contains no indication that defendant was aware of this claimed misconduct by the stepfather, it could not provide a basis for giving the instruction defendant now urges it was error to omit. The only evidence presented which might establish defendant's subjective belief that force was necessary (*People v. Lockett* (1980), 82 Ill. 2d 546, 553) was defendant's testimony that she attempted to restrain her *sister* from stabbing her stepfather. While it is true that the instruction must be given if evidence is presented which, if believed by the jury, might establish that defendant had an unreasonable belief that force was necessary (*People v. Leonard* (1980), 83 Ill. 2d 411; *People v. Lockett* (1980), 82 Ill. 2d 546; *People v. Joyner* (1972), 50 Ill. 2d 302), we find no evidence to support such instruction here. Consequently, there was no error in the refusal of the court to so instruct the jury. *People v. Handley* (1972), 51 Ill. 2d 229; *People v. Lyons* (1967), 36 Ill. 2d 336; *People v. Latimer* (1966), 35 Ill. 2d 178; *People v. Marsh* (1949), 403 Ill. 81.

The balance of defendant's arguments concern the testimony of Danny and Debbie Saylor. She urges that the action of the court in calling them as court's witnesses on the court's own motion "is evidence tending to show the trial court's overstepping the bounds of neutrality." She contends, too, they they were improperly impeached by prior inconsistent statements, that the trial court erred in allowing the jury to hear Debbie Saylor's second refusal to testify, and that the trial court erred in reopening the case to

present her testimony over objections by both State and defendant.

Where a witness has testimony material to the issue, where his veracity is questionable, and where there might otherwise be a miscarriage of justice, the court may call that witness as a court's witness. (*People v. Dennis* (1970), 47 Ill. 2d 120; *People v. Moriarity* (1966), 33 Ill. 2d 606; *Carle v. People* (1902), 200 Ill. 494.) This power is not limited to eyewitnesses (*People v. Siciliano* (1954), 4 Ill. 2d 581), and it may be exercised on the court's own motion (*People v. Wesley* (1959), 18 Ill. 2d 138, 152, *cert. denied* (1960), 364 U.S. 845, 5 L. Ed. 2d 69, 81 S. Ct. 87). These foundational requirements were properly met for both Danny Saylor and Debbie Saylor, and defendant does not argue otherwise. Nor does she contend that a court's witness may not be impeached by the use of the prior inconsistent statement, but only that such impeachment here was improper because it impermissibly imparted "substantive character" to those statements, an argument for which no authority is offered.

A court's witness may be impeached as any other witness. In *People v. Collins* (1971), 49 Ill. 2d 179, this court was asked to adopt a rule which would allow prior inconsistent statements to be used as substantive evidence but declined to do so at that time. (See also *People v. Gant* (1974), 58 Ill. 2d 178; *cf. People v. Paradise* (1964), 30 Ill. 2d 381 (wherein the orthodox view, the present rule, is articulated).) The jury was instructed, prior to deliberations, that prior statements of witnesses inconsistent with their testimony could be considered in determining the weight to be given the testimony. Defendant did not request a limiting instruction at the time the prior statements were used.

Although defendant now contends that Assistant State's Attorney Hyman's testimony that he took a statement from Danny Saylor and that Danny Saylor was coherent and gave responsive answers to Hyman's questions was relevant only

"to substantiate the truth of the prior statement," she made no such objection at trial. Defendant made only a general objection, which was overruled, and the waiver rule does not permit the new argument now sought to be presented. Therefore, we consider the issue thus waived for lack of specific objection. (*People v. Queen* (1974), 56 Ill. 2d 560, 564; *People v. Trefonas* (1956), 9 Ill. 2d 92, 98; *cf. People v. Carlson* (1980), 79 Ill. 2d 564, 576; *People v. Akis* (1976), 63 Ill. 2d 296, 299; *People v. Ross* (1968), 41 Ill. 2d 445, 462-63, *cert. denied* (1969), 395 U.S. 920, 23 L. Ed. 2d 237, 89 S. Ct. 1771.) In *Carlson* we noted that plain error would be recognized only where there was substantial injustice to the defendant. Mr. Hyman's testimony did not involve the substance of Danny Saylor's statement to the police but concerned only his demeanor at the time of giving it. Moreover, the jury learned nothing new from Saylor's prior statement because Minigh's testimony was substantially the same. Under these circumstances any error which may have occurred was not prejudicial.

Nor do we find error in the calling of Debbie Saylor as a court's witness or in the State's use of her prior statements to impeach her. Defendant argues that the court erred in allowing the jury to hear her refusal to testify and in asking her, at that time, if she was defendant's sister. In view of the facts that both Debbie and defendant were identified as sisters of Danny Saylor during his testimony and that Debbie did subsequently testify and that no comments by the court or the State were made about her initial refusal, we do not agree that error was committed.

The appellate court found that the State used Debbie's prior statement improperly because it made "extensive use" of it and read it line for line in a question and answer format. The record does indicate that a number of questions and answers from Debbie's statement were read to her and she was asked if she had made them. We note, however, that she was asked only about inconsistencies between that

statement and her present testimony, and there was no undue emphasis or repetition in the questioning. That there were extensive inconsistencies can hardly be held against the State. There was no error in the use of this statement in this manner. (*People v. Marino* (1970), 44 Ill. 2d 562.) Defendant appears to have abandoned this argument and, rather, now alleges error in the State's repetition of part of Debbie's prior statement in its closing argument. Defendant, however, did not object when the remarks were made and cannot now complain. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 577; *People v. Moore* (1973), 55 Ill. 2d 570, 576; *cf. People v. Baptist* (1979), 76 Ill. 2d 19, 30.) Moreover, the remarks were made by way of comment upon the credibility of Debbie's testimony and proper in that regard. See, *e.g., People v. Sinclair* (1963), 27 Ill. 2d 505; *People v. Weaver* (1959), 18 Ill. 2d 108.

Defendant also argues that the court erred in calling Debbie Saylor as a court's witness after both sides had rested. This is a discretionary power of the court (*People v. Cross* (1968), 40 Ill. 2d 85; *People v. Franceschini* (1960), 20 Ill. 2d 126), and we find no abuse here. Defendant argues, relying on *Brooks v. Tennessee* (1972), 406 U.S. 605, 32 L. Ed. 2d 358, 92 S. Ct. 1891, that this amounted to penalizing her for exercising her right not to testify. In *Brooks* the Supreme Court held that a statute which required that a defendant must testify first, if at all, violated an accused's constitutional right to remain silent. That case is entirely inapposite to the situation presented here, where defendant was twice given the opportunity to testify, and where that right was exercised the second time. We find no error.

Nor do we find merit in defendant's argument that the court in some way intimidated Danny Saylor with a threat of a perjury charge. The court, upon being told that his testimony would differ from a prior statement simply told defense counsel, the prosecutor and Saylor's attorney that the immunity granted would not cover perjured testimony.

In the context of that discussion, and in view of the fact that Danny Saylor did in fact testify contrary to his prior statements, we find the defendant's argument untenable.

Nor is there merit in defendant's argument that she was acting under provocation, and that the jury should have been instructed that defendant could not be found guilty of murder if she killed decedent while acting under a sudden, intense passion resulting from serious provocation by him. To the extent this argument may not be answered by our earlier discussion of the dearth of evidence of provocation, it has been waived by failure to request and tender the instruction and failure to include it in a motion for a new trial. *People v. Carlson* (1980), 79 Ill. 2d 564, 581-82; *People v. Roberts* (1979), 75 Ill. 2d 1; *People v. Precup* (1978), 73 Ill. 2d 7.

Accordingly, the judgment of the appellate court is reversed and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE GOLDENHERSH, dissenting:

I dissent. I would affirm the judgment of the appellate court and remand the cause for a new trial. I agree with the appellate court that the oral instruction directing the jury to decide whether defendant was guilty of murder prior to considering the charge of manslaughter served to erroneously circumscribe the jury's right to choose which offense, if any, defendant had committed. I am also of the opinion that under *People v. Roberts* (1979), 75 Ill. 2d 1, *People v. Underwood* (1978), 72 Ill. 2d 124, *People v. Jenkins* (1977), 69 Ill. 2d 61, and *People v. Joyner* (1972), 50 Ill. 2d 302, the giving of the instruction resulted in a "substantial defect" which was not waived, and that it was properly recognized as plain error.

The People concede in their brief that the circuit court

correctly gave the manslaughter instruction, based on section 9—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(a)). Properly instructed, the jury should have been free to consider the elements of the offenses charged and determine which offense, if any, had been proved by the evidence. There is no rule of law, statutory or opinion, which required that the most serious offense be considered first.

It must be presumed that the jury followed the court's oral instruction. It may therefore be assumed that the jury examined the evidence solely in the light of the instructions concerning murder, thus precluding consideration of the evidence which was the basis for the giving of the manslaughter instruction.

I do not agree with the majority that the evidence of guilt is overwhelming. On this record, properly instructed, the jury could have found defendant guilty of manslaughter, or acquitted her. Fundamental fairness and simple justice require that defendant be given a new trial.

JUSTICE SIMON joins in this dissent.

JUSTICE SIMON, also dissenting:

I believe that a new trial is necessary for an additional reason. Danny Saylor's statement to police that his sister, the defendant, had admitted participating in the crime was improperly used as impeachment evidence.

At the defendant's trial, Saylor was called as a witness by the State. Saylor had previously told police that the defendant had admitted participating in their stepfather's murder by hitting him over the head with a pipe while her younger sister, Debbie Saylor, repeatedly stabbed him. He informed the court, however, before his testimony, that he would contradict that statement. True to his word, Danny Saylor did contradict his previous statement by testifying that it was Debbie Saylor, not the defendant, who had said that the defendant hit the victim over the

head with a pipe while she, Debbie Saylor, repeatedly stabbed him—same statement, different speaker. He did testify, however, that the defendant was with Debbie Saylor at the time she made that statement to him and did not protest or contradict it. At the request of the State, the court then made him a court's witness and allowed the State to impeach his testimony with evidence of his prior statement.

Under the circumstances, impeachment evidence of any kind was inappropriate. The defendant's brother's testimony did not damage the State's case. It helped it. Defendant's silence in the face of her sister's statement could be construed as an admission. The purpose of impeachment evidence is to discredit direct testimony. A prior inconsistent statement is admitted into evidence only to cancel out the witness' testimony and not as substantive evidence. Otherwise it is usually hearsay. The State would have been in a worse position if both statements had been cancelled out than if Saylor's in-court statement had been allowed to stand. It therefore had no legitimate reason to impeach his testimony with his prior statement.

The State's purpose in introducing this evidence as a prior inconsistent statement could only have been so that the jury might use it as substantive evidence of defendant's guilt. This is impermissible.

In *People v. Johnson* (1929), 333 Ill. 469, this court was presented with a similar situation. Prior to trial, a witness told police that she had purchased a radio, very similar to one taken in a burglary, from the defendant, who was accused of the burglary. On the stand, however, she testified that she had bought the radio, not from the defendant, but from a curly-headed friend of the defendant while in the defendant's presence. As such, the testimony was still helpful to the State's case, although not as helpful as the witness' pretrial statement to the police. The court held that it was therefore not impeachable and

reversed the defendant's conviction.

In *People v. Chitwood* (1976), 36 Ill. App. 3d 1017, a witness told police that the defendants had told her they had burglarized two schools. During the trial, however, she denied that the defendants had told her anything about the burglary. The trial judge made her a court's witness and allowed the State to impeach her with her previous statement.

On appeal, the court held that she could not be impeached by the State because there was nothing to impeach. It quoted Professor McCormick:

" 'An affirmative answer would have been material and subject to be impeached by an inconsistent statement, but a negative answer is not damaging to the examiner, but merely disappointing, and may not be thus impeached. In this situation the policy involved is *** the protection of the other party against the hearsay use by the jury of the previous statement.' (McCormick, Evidence sec. 36 (2d ed. 1972) (footnotes omitted).)" 36 Ill. App. 3d 1017, 1025.

I think *Johnson* and *Chitwood* represent proper rejections of the use of prior statements under the circumstances presented by this case, and I would follow them.