THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTORIO GUTIRREZ, properly known as Marco Alvarez, Defendant-Appellant.

First District (5th Division) No. 1—86—1376

Opinion filed August 3, 1990.—Rehearing denied September 27, 1990.

232

234

236

Randolph N. Stone, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Sharon L. Heath, Special Assistant State's Attorney, and Inge Fryklund, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

Defendant, Marco Alvarez,[1] appeals his conviction and sentence following a 1986 jury trial. Alvarez was indicted by a Cook County grand jury on murder charges arising from a fatal shooting outside a Chicago social club. He was found guilty and sentenced to 38 years' imprisonment. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a).) On appeal, defendant contends that he was denied a fair trial for one or more of the following reasons: (1) the State's failure to produce certain documents in violation of discovery rules; (2) the court's refusal to give a jury instruction on voluntary manslaughter; (3) improper and prejudicial comments during the prosecutor's closing argument; and (4) the State's failure to prove venue. He asks this court to reverse his conviction and remand the case for a new trial. Alternatively, in the event his conviction is affirmed, he requests a reduction in his sentence. Defendant maintains that the trial judge abused his discretion in sentencing him to a near maximum term, in light of his personal history and rehabilitation potential, and that the State's improper use of victim impact testimony entitles him to a new sentencing hearing.

The record reveals the following undisputed facts. At approximately 6 a.m. on January 19, 1985, Henry Vieyra was shot and killed instantly as he was about to enter a friend's car, which was parked in the near vicinity of the Shyway Club (Shyway's), an all-night bar at the corner of Blue Island Avenue and South Wood Street in Chicago. The bar had just closed for the night, and the temperature was well below zero. Vieyra and other patrons left the club at approximately the same time to walk to their cars. Several of these persons testified as eyewitnesses to the shooting. In her opening statement, defense counsel conceded that Alvarez did, in fact, fire the single bullet that struck and killed the decedent. The question for the jury was whether defendant was guilty of murder as charged, or of the lesser included offense of involuntary manslaughter, based on his testimony that he had fired the gun recklessly, but without intent to harm Vieyra. Codefendant Javier Garcia, the driver of the car from which Alvarez fired the fatal shot, was charged with murder under an accountability theory. He was contemporaneously tried before the bench and acquitted.

---

[1] Defendant was indicted and tried, and the notice of appeal was filed, in the name of "Victorio Gutirrez," although defendant's real name is Marco Alvarez. The Gutirrez name was mistakenly applied to him because he was carrying a borrowed driver's license at the time of his arrest. Throughout his trial, defendant was addressed by the court and counsel as Marco Alvarez. This opinion will likewise refer to him as Marco Alvarez.

Jury selection for defendant's trial began and was completed on April 21, 1986. Before *voir dire* began, the assistant State's Attorney stated for the record that Alvarez was raising no affirmative defenses to the murder charge. One of the two attorneys representing the defendant confirmed that she had so informed the State. The next day, following the opening statements of counsel and the testimony of Elena Vieyra, the "life and death" witness, the State called its first eyewitness, Antonio Galarza.

Antonio Galarza testified that he had been Henry Vieyra's friend for about five years. On January 19, 1985, at approximately 5:45 a.m., Galarza saw Vieyra in Shyway's. Galarza then went out to his truck, which was parked across the street, in order to look for his keys. Discovering that his keys were in the ignition, and that the truck was locked, Galarza returned to the bar. On his way into the building, he noticed two heavy-set Hispanic men who were leaving. Galarza stated that he had never seen these individuals at Shyway's before. He made an in-court identification of Marco Alvarez and Javier Garcia as the two individuals whom he saw leaving the club. Galarza further testified that, about 10 minutes later, he left the club to go home, accompanied by his friends Eddy and Linda. As they were walking out, Galarza noticed a car coming from the south on Wood Street and "creeping very slowly" northward toward Blue Island, with its lights on. The car was coming from an area of Wood Street which is a dead end. Upon reaching Eddy's car, Galarza stood on the sidewalk while another friend of Eddy's attempted to jump start the engine. Galarza further stated that he was still watching the car on Wood Street, which at this point was standing still. He described this car as a gold Cadillac with a white top. At that moment, "a hand just came out of the window" of the Cadillac's passenger side, and Galarza heard one shot. Then he heard the squeal of the Cadillac's tires as it turned right and drove east on Blue Island Avenue. As the car drove toward him before it turned, Galarza observed the driver through the untinted front window. He identified the driver as Javier Garcia.

Galarza further testified that when the shot was fired, the Cadillac had stopped beside a black car which was parked on Wood Street, facing the garage door of a factory building. He stated that when the hand came out of the Cadillac's passenger-side window, the window was about three feet away from the rear of the black car, and about five to six feet away from its driver's side door. As Galarza ran closer to the black car in order to get a better view and description of the fleeing Cadillac, he noticed that Vieyra was lying facedown on the ground beside the car, with his head toward the west, away from the

building. Almost immediately after Galarza reached Vieyra, a Chicago police sergeant arrived in a squad car and called an ambulance. The sergeant eventually drove Galarza and Eddy to the police station. Galarza further stated that he there identified a vehicle in police custody as the same Cadillac which he had seen at Wood and Blue Island.

On cross-examination, Galarza estimated that there were 45 to 50 people in the club that night, and stated that he had not been in Vieyra's company the entire time. Galarza further testified that he had earlier seen Vieyra, between 2 a.m. and 4 a.m., in another lounge. He stated that Vieyra had consumed some alcoholic drinks at both bars, but was acting "normal" and did not appear to be under the influence of alcohol or drugs. Galarza described his own alcoholic consumption as two drinks during a 45-minute period at Shyway's. He stated that he had consumed only nonalcoholic drinks at the other bar. With regard to the shooting, he further explained that he saw an arm, with a gun, extend "straight out" from the closed passenger-side door of the Cadillac. He also testified that he drew a diagram of the scene for a police officer at the station, indicating with "X"'s where he was standing, where his truck was, and where the cars involved in the shooting were, but not indicating any distances in feet. He stated that he believed he had left the diagram with the police.

Following Galarza's testimony, defense counsel informed the court that they had never received a copy of the diagram Galarza described, although they had filed discovery motions and had subpoenaed police street files. The assistant State's Attorney responded that he did not have the diagram, did not know if one existed, and would check further with the detectives assigned to the case.

Victor Quezada was the State's next witness. He testified that he had been Henry Vieyra's friend for about eight years. At approximately 5:50 a.m. on January 19, 1985, he had spoken with Vieyra in the Shyway Club and had arranged to get a ride home with him. Quezada further stated that he had left the bar soon after Vieyra did, and walked across Blue Island Avenue toward a black Cutlass automobile parked on Wood Street. As he was crossing Blue Island, he saw a gold Cadillac with a white top, "pulling up very slowly" from the south on Wood Street. He also saw Vieyra walk to the black Cutlass. Just as Vieyra was about to get inside the car, with his back facing Quezada, the Cadillac "crossed between" Quezada and Vieyra. Quezada then heard a shot, saw the Cadillac "take off," screeching, and then saw it turn east onto Blue Island Avenue. He also saw Vieyra fall to the ground. Quezada further testified that Vieyra was facing the building when the Cadillac pulled up, and that he did not

turn around or speak before the shot was fired. Quezada stated that he did not see anyone inside the Cadillac because it had tinted windows. He estimated that the distance from the Cadillac to where Vieyra was standing on the driver's side of the Cutlass was five to six feet.

On cross-examination, Quezada testified that he had consumed about five tequila and grapefruit drinks at Shyway's between 2:15 a.m. and 6 a.m. He further stated that he came to the bar directly from home, where he had not been drinking. On further examination, he acknowledged that his left eye was a glass eye. While he was able to see the full driver's side of the Cadillac, he had not actually seen the shot being fired.

Sergeant Michael Mulligan testified that on January 19, 1985, he was assigned to the Chicago police department's 10th District, an area which included 2309 South Wood Street, the address at which Henry Vieyra's body was found. Sergeant Mulligan related that he was in a police squad car at approximately 6:30 a.m. when he received a report of a man shot at Wood and Blue Island, less than three blocks away. When he arrived on the scene, about six people were gathered around a man who was lying on the ground. The man was lying one to two feet from a car door. Mulligan further testified that when he turned the man over, he observed a gunshot wound to the man's back, about six inches down from the shoulder and about one-half inch to the left of his coat's center seam. He stated that the victim appeared lifeless, with no vital signs. After radioing a description of the suspects and their vehicle to police patrols in the surrounding area, Mulligan transported Galarza and another witness to a police station. Mulligan recalled that Galarza there identified the Cadillac, which had been apprehended about 20 minutes after the radio message was transmitted.

Following Mulligan's testimony, defense counsel once again stated that they would not be raising the affirmative defense of self-defense. However, they informed the court that they would be seeking an involuntary manslaughter jury instruction if later testimony supported a theory that the fatal shot was fired recklessly and only to scare or warn the victim. The court ruled that the defense was free to raise any facts that were within the scope of the charges and would not be precluded from presenting evidence which might make an involuntary manslaughter instruction appropriate.

Dr. Diane Scala-Barnett, a forensic pathologist, testified that she performed an autopsy of Henry Vieyra on January 20, 1985. Her examination revealed an entrance gunshot wound to decedent's back

and an exit gunshot wound to his chest. Dr. Scala-Barnett traced the course of the bullet, which she testified first hit the spine, then the lung, and then the right main stem bronchus before exiting the chest. She further described the bullet's course as back to front, "almost a direct course." She stated that the entrance wound was 14.7 inches beneath the top of decedent's head and one-half inch to the left of the midline near the spine. The chest exit wound was 15 inches beneath the top of decedent's head and 3.5 inches to the right of the midline. Dr. Scala-Barnett agreed with the statement that only ³/₁₀-inch differ- ence between entrance and exit wounds indicated a flat plane for the bullet, rather than an upward or downward projectory. She added that it also indicated that the bullet was not deflected. It was Dr. Scala-Barnett's medical opinion that the gunshot wound to Vieyra's back was the cause of his death.

Yolanda Garcia testified that she was with Vieyra at approxi- mately 6 a.m. on January 19, 1985. She recalled that she, Vieyra, and her friend, Lupe, left Shyway's at that time and walked to her black Oldsmobile Cutlass which was parked diagonally across the street from the bar. While she went to the driver's side of her car, Vieyra and Lupe walked to the passenger side. Then she asked Vieyra to drive. While the two women entered the car and she operated the power locks to open the doors, Vieyra walked around the rear end of the car to the driver's side. Garcia further stated that as Vieyra was "standing between the door and getting into the car," she saw a large car "right behind" them. She estimated that the distance between the side of that car and the rear bumper of the Cutlass was four to five feet. She further stated that she next saw Vieyra falling to the ground, and immediately went to help him, but discovered that he was not moving and appeared to be dead.

On cross-examination, Garcia testified that she had arrived at Shyway's at 2 a.m. with Lupe and had joined Vieyra there. She stated that she had consumed only one drink during her four hours at Shy- way's, and one drink elsewhere before 2 a.m.

The State's next witness, Chicago police officer Donald Houlihan, testified that on January 19, 1985, at 6:10 a.m., he received a radio message describing a vehicle and two males involved in a shooting. As he and his partner approached 17th Street in a marked squad car, he observed a gold Cadillac parked on Halsted Street, with its lights off and engine running. When the car drove away, the officers followed for a few blocks before signalling the car to pull over. Houlihan identi- fied Javier Garcia as the driver of the vehicle and defendant as the passenger. After Garcia exited the car and was searched, he informed

the officers that the passenger would have to exit from the driver's side, as the passenger side door did not open. Houlihan stated that defendant immediately slid across the seat and came out of the car. While his partner watched the two men, Houlihan searched the inside of the Cadillac for weapons. He observed, partially visible on the floor, under the end of the passenger seat, a .38 caliber revolver. He broke the weapon open, revealing five live rounds and one expended shell casing. Both defendant and Garcia were then placed under arrest. The arrestees and the Cadillac were driven to Area 4 police headquarters, where the revolver and Cadillac were inventoried. Officer Houlihan further stated that defendant gave his name as Victorio Gutirrez but produced no identification bearing that name.

On cross-examination, Houlihan stated that neither Garcia nor defendant resisted arrest in any way. He recalled noting in his arrest report that defendant had been drinking. He further stated that he did not find a driver's license during his search of the Cadillac.

Officer Timothy McKeough, a mobile unit technician with the Chicago police department crime laboratory, testified that he and his partner, at approximately 6:30 a.m. on January 19, 1985, were assigned to investigate a homicide at the intersection of Blue Island Avenue and Wood Street. When the officers arrived at the scene, they observed a black Oldsmobile parked next to the shipping and receiving area at the rear of a factory. McKeough related that there was blood on the pavement near the driver's side door, about one foot from the vehicle. He then testified as to the photographs he took and the evidence he collected at the scene. Among the articles collected were a fired bullet, a knife, several metal buttons and a small religious medal. The bullet was found on the pavement, in close proximity to the blood, on the driver's side of the car. McKeough described the knife as a folding knife with a wooden handle. The wood was missing from one side of the handle. The knife, which was closed, was found on the pavement about two feet under the Oldsmobile. McKeough further testified that he administered a gunshot residue test to defendant at the police station. He recalled defendant stating at this time that he was right-handed and that he had last washed his hands at approximately 11 p.m. the previous night. McKeough performed the residue test on the back and palm of defendant's right hand, and on the back and palm of defendant's left hand.

On cross-examination, Officer McKeough stated that defendant identified himself as Marco Alvarez and that his police report identified defendant by that name. He clarified that the folded knife, when found by police, was two feet underneath the Cutlass, from the driv-

er's side. He further stated that he did not take fingerprints from the knife, but that it was submitted to the microanalyzer to be dusted and checked for the presence of blood, after which it was sent for laser analysis, to check for latent fingerprints. He also stated that he had no reports of the laser test for fingerprints and was not certain as to what the test results had been.

Following Officer McKeough's testimony, defense counsel moved for a mistrial. In support of her motion, she stated that she had never received McKeough's written report during discovery, either from the assistant State's Attorneys handling the case or through her subpoena of police street files. She further maintained that she had not learned of the knife until the first day of trial, when the prosecutor showed her McKeough's report, and she informed him that she had never received a copy of it. She stated that she still had not received a copy. Defense counsel argued that the report was important because it included a description of a knife discovered under the victim's car. She also contended that McKeough's testimony, indicating that there possibly may have been fingerprints on the knife, could seriously affect defense counsel's trial strategy, in terms of requesting a jury instruction on voluntary or involuntary manslaughter. Yet she had never received a laboratory report indicating the results of the laser fingerprint test. She argued that for these reasons, in addition to the absence of the diagram drawn for police by eyewitness Galarza, a mistrial was warranted.

The assistant State's Attorney responded that he had conversed with defense counsel prior to jury selection on the first day of trial, and that she had specifically requested, at that time, that the knife be brought to court. She had also asked whether the knife had been inventoried and whether it was available. Based upon that request, he had arranged to have the knife in the courtroom during the trial. He further maintained that a photograph of the knife taken at the scene of the shooting was made available to defense counsel prior to trial. As to the laser fingerprint test, he explained that he was in possession of a worksheet indicating the results of that test. He had received the worksheet during discovery, attached to a copy of defense counsel's subpoena of police files. He had therefore assumed that defense counsel had also received the worksheet. He further stated that he had noted in his case file that all discovery had been tendered to the defense.

The trial judge resolved the matter by having both McKeough's report and the laboratory worksheet duplicated and tendering copies to defendant's attorneys. He further stated that he would have

granted defense counsel's earlier motion for a continuance, which was made just prior to jury selection, solely on the grounds of scheduling conflicts, if she had also made the court aware at the time that she had not received these reports. Had she done so, the court also would have required the State to tender them prior to trial. The court then concluded that the motion for a mistrial was untimely at this advanced stage of the proceeding and would therefore be denied. The trial judge also indicated that he would entertain a defense request, at the close of State's evidence, for any additional time that might be needed because of information contained in the two documents. Both reports were made part of the trial record and are contained in the record on appeal.

The trial continued with the testimony of Jean Goliak, a chemist for the Chicago police department crime laboratory. Goliak explained that gunshot residue testing indicates the presence of lead, barium and antimony, which are components of the residue mixture expelled from a discharged firearm and deposited on the hands of the shooter. She further stated that she analyzed swabs taken from defendant's hands, using an atomic absorption spectrophotometer. The results of her analysis showed that all four swabs, *i.e.*, a right back, right palm, left back and left palm, contained amounts of these three substances which were over the threshold levels indicating the positive presence of gunshot residue. More specifically, Goliak stated that the level of antimony for all four swabs was "right in the range of .20 parts per million." Goliak further stated that the amounts of lead, in parts per million, were so high that they were "over range" for her instrument and could not be accurately determined. Her opinion, based upon these results, was that defendant had either fired a weapon, handled a recently fired weapon, or was in close proximity to a weapon when it was fired.

Following Goliak's testimony, the defense moved to amend its discovery answer (107 Ill. 2d R. 413(d)), to include the affirmative defense of self-defense, based on the police documents which it had received the previous day. The State objected, contending that its case would be prejudiced if it had to bear the additional burden of disproving self-defense at a point in the trial when all but one of its witnesses had already testified. One of the assistant State's Attorneys reiterated that he had received McKeough's report and the laser test worksheet attached to a copy of defense counsel's subpoena, which indicated that those documents were also sent to defense counsel on a specified date. The trial judge, stating that he believed that altering the course of the proceedings at this stage would prejudice the State,

denied defense counsel's motion.

Ernest Warner, a firearms examiner for the Chicago police department, was the State's final witness. He identified a weapon as the same Smith and Wesson, model 15, .38 special caliber revolver which he had received from a Chicago police area 4 detective on January 19, 1985, along with five rounds of ammunition and one discharged cartridge case. He also identified a fired bullet received from Officer McKeough on that date. Warner testified that the revolver, which was in very good working order, had specially manufactured grips with a hard rubber coating, designed to give the user a more secure grip on the weapon. He further stated that the trigger was a "target trigger," as distinguished from a regular trigger, explaining that its serrated texture gives the user "more positive control over whether he will pull the trigger or not." Warner also stated that the revolver had a "target hammer," which would provide greater control in cocking the weapon. He testified that the weapon also varied from the typical revolver in having an adjustable rear target sight. The rear sight could be raised or lowered by means of adjustable top and side screws so that the sight picture could be brought into coincidence with where the bullet would actually strike, rather than indicating only the general direction of the bullet, as do fixed sights. Warner further testified that the characteristics of the fired bullet received from Officer McKeough and a bullet which he test fired from the revolver indicated that the former was "fired from [that revolver] to the exclusion of all other weapons in the world."

On cross-examination, Warner explained that in order to use the sights on the revolver while firing at a target, it is necessary to align one's eye with the rear sight and the front sight. He acknowledged that if a person were holding the gun out toward his target, but were looking another direction, the sights would be irrelevant to the weapon's accuracy, because the shooter has to be looking at the sights in order to use them. On redirect examination, Warner further clarified that a person does not have to use the sights in order to fire the gun. He stated that the sights are used to ensure accuracy when firing at a target. He also described the general target range of a .38 special Smith and Wesson revolver as "up to 50 yards."

The defense opened its case with the stipulated testimony of Dr. Michael Schaffer, a toxicologist employed by the office of the medical examiner of Cook County. Dr. Schaffer testified that on January 20, 1985, he tested blood samples taken from the body of Henry Vieyra. His tests revealed the presence of cocaine in the amount of 1.3 micrograms per milliliter. He further testified that a normal person would

feel the effects of cocaine when the level in his blood reached 1.0 micrograms per milliliter.

Defendant, testifying in his own behalf, stated that he lived with his mother and four siblings in Chicago, and had previously served in the United States Army. He then gave the following account of the events surrounding the death of Henry Vieyra. On January 18, 1985, defendant agreed to meet his friend, Javier Garcia, at 10 p.m. Garcia drove to defendant's home at that time, and the two men "went riding around" in Garcia's van, drinking a six-pack of beer, for about 30 to 45 minutes. During this time, defendant noticed that Garcia placed a gun under a tire in the back of the van. Defendant stated that the men then stopped for a short time at defendant's house. While there, defendant asked his sister's boyfriend, Victorio Gutirrez, if he could borrow his driver's license. Defendant explained that he and Garcia had discussed visiting some Rush Street bars, and that he would need some identification because he was 20 years old at the time. Defendant placed Gutirrez' license in his coat pocket. He and Garcia then drove the van to a lounge, arriving there at about 11:20 p.m. Defendant stated that between 11:20 p.m. and midnight, he consumed "about five to six shots of tequila with some beer chasers." Then he and Garcia left and drove to another lounge, where defendant consumed "roughly about seven gin and tonics, about six or seven shots of tequila, and about three or four beers." At approximately 2:30 a.m., defendant saw another friend at the lounge and asked if he could borrow the friend's car. Defendant described the car as a gold Cadillac with a white top and "black windows." He explained that no one outside the car could see the interior through these windows. Defendant further stated that after driving this friend to his girl friend's house, defendant drove the Cadillac back to the lounge, where he consumed more tequila and five gin and tonic drinks. He and Garcia left the lounge at approximately 4 a.m., with Garcia driving the van and defendant driving the Cadillac. After parking the van at Garcia's house, the two men drove to the Shyway Club, with defendant at the wheel.

Defendant further testified that he had been at Shyway's for about 15 minutes when he noticed a man staring directly at him, "making *** a point of catching [defendant's] attention." Defendant had seen the man before, but did not know his name. He later learned that the man's name was Henry Vieyra. Defendant stated that the man, while talking to several others at the bar, turned his head and started to stare, "bobbing his head," and "looking at [defendant] all crazy." He further related that he thought that the man was trying to

"pick a fight or something." However, because defendant did not know the man, he "didn't pay too much attention." The man repeated this behavior about 8 to 10 times while defendant was in the bar, and defendant testified that he took this behavior "as a challenge." However, no altercation between the two men ever took place. Defendant further recalled that he remained at Shyway's for about 1 hour and 20 minutes, during which time he drank "six or seven gin and tonics and maybe a beer or two." He and Garcia left the lounge when someone announced that it was closing.

Defendant then recounted his actions after leaving the Shyway Lounge. He testified that he was feeling the effects of alcohol as he walked out to the Cadillac. He asked Garcia to drive. Then, as he moved over to the passenger side of the front seat, he noticed that there was a gun on the floor, under the seat. Defendant further testified that he and Garcia drove westbound on Blue Island, made a right turn, then another right turn down a side street, driving for a block before coming out on Wood Street, facing south. They then decided to go to the city's south side to see whether any bars there might still be open. Driving southbound on Wood, they came to a dead end, where they made a U-turn. Defendant stated that as the Cadillac traveled northbound on Wood, he noticed a man standing by the passenger side of a black car, looking inside the car. He recalled that the man came around the rear of the black car "while [he and Garcia] were passing by" at about one to three miles per hour. Defendant further testified that by the time the man had reached the driver's side of the black car and had opened the door, the Cadillac had already passed him. Defendant then told Garcia that the man was the same person who had been staring at him in Shyway's. At this point, the Cadillac "stopped," about 15 to 20 feet away from where the man was standing. Defendant stated that the Cadillac's window "went down," and that he stuck his head out of the window, intending "to ask this man what his problem was." At that moment, Vieyra, who was already looking over his shoulder at defendant, placed his right hand into his coat. Defendant further testified that when he saw Vieyra reach into his coat, he picked up the gun from the floor of the Cadillac, stuck the gun out of the window behind him, and with his head facing forward, fired one shot. Asked to explain why he fired the gun, defendant responded that he thought Vieyra might pull out a weapon from his coat. He wanted to "get a jump on [Vieyra]," so he "shot to scare him." Defendant also stated that he was not aiming at Vieyra and did not mean him any harm. He testified that as soon as he saw Vieyra fall to the ground, he and Garcia "took off."

On cross-examination, defendant acknowledged that he had pointed the gun out of the window in Vieyra's direction, but stated that he did not know that he shot him. He unequivocally stated that he was not angry with Vieyra at the time he fired the shot. Defendant further testified that he had received marksmanship training, solely in the use of rifles, during military service. However, he stated that he had never fired a handgun before this incident. Defendant identified the .38 caliber revolver previously identified and described by Warner as the same gun that he had found under the seat of the Cadillac after leaving Shyway's. He stated that it also appeared to be the gun that he had seen in the van, but denied that he had taken it from the van and placed it in the Cadillac. He also testified that he had never seen that particular revolver before; when he picked it up from the floor, he had assumed that it was loaded, but was not certain. Defendant further stated that at the moment when his head was completely outside of the Cadillac, the vehicle was stopped, and he saw Vieyra reach inside his coat, he feared for his life. However, he later testified that when the shot was fired, he was not in danger. As to the manner in which he fired the revolver, he clarified that he held the gun in his right hand, which was extended backward, out the window, while at the same time he looked ahead, through the front windshield. He stated that his left hand was not involved. Defendant further testified that Vieyra never spoke to him or approached him in Shyway's, and that he was neither angry nor upset with Vieyra while in the bar. He further acknowledged that he never saw Vieyra with a gun, knife, or any other weapon, either in Shyway's or on the street. Defendant also stated that he had nothing with him that night which identified him as Marco Alvarez.

During the jury instructions conference, defense counsel stated for the record that she had not tendered any instructions on self-defense or voluntary manslaughter. She further stated that this did not reflect a strategy decision, but resulted from the court's prior ruling, denying her motion to amend her discovery answer to include an affirmative defense. The jury received verdict forms for not guilty, guilty of murder, and guilty of involuntary manslaughter. The defense raised no objections to the Illinois Pattern Jury Instructions (IPI) given for murder and involuntary manslaughter, which included the definition of recklessness.

In their closing statements to the jury, the prosecutors argued that Henry Vieyra was "assassinated" by defendant, who staged a premeditated murder masked by a U-turn on a dead-end street, and facilitated by a "get away driver." While defense counsel raised no

objection to any part of the State's opening argument, the prosecutor's comments on rebuttal elicited numerous defense objections, most of which were sustained by the trial judge. Pertinent portions of the transcript read as follows:

"PROSECUTOR [Assistant State's Attorney]: *** Ladies and gentlemen, murder in the real terms is not like it is depicted on t.v. [*sic*]. You don't have to plan it for a week. You don't have to get plastic explosives and go out and buy a gun. He had a gun. He doesn't go anyplace without the gun. He had it in the van—.

MS. SIEGAL [Defense attorney]: Objection.

THE COURT: I will let counsel continue his argument.

\* \* \*

PROSECUTOR: *** He is suppose [*sic*] to be found not guilty because he only fired one shot. He is a pro. He is trained like a Mafia hit man, one shot, he has got a gun that is designed for one shot, double sights, special trigger, special grip. He is a pro, fifteen feet away. ***

MS. SIEGAL: I would object to the characterization 'as a pro.'

THE COURT: I would sustain the objection.

MS. SIEGAL: I ask further, Judge, that you instruct the jury to disregard that statement.

THE COURT: I would so direct the jury to disregard the argument that the defendant is a pro.

PROSECUTOR: Well, let's look at the evidence, and let's decide whether he is nor not.

MS. SIEGAL: Objection, Judge.

THE COURT: I will sustain the objection.

\* \* \*

PROSECUTOR: *** They want you to find him not guilty because the man at the car, Henry Vieyra, the man without a knife and without a gun, reaches into his pocket. *** How many of you, ladies and gentlemen, getting into your automobile, put your hands in the pockets, making yourselves the victim of this man, because he is going by—.

MS. SIEGAL: Objection.

THE COURT: I will let counsel make his argument.

\* \* \*

PROSECUTOR: *** Let's talk about reckless. Reckless is if I cock this and throw the gun, and it goes off. *** Or if I throw it into a fire and powder explodes and bullets go off and

hit somebody. That is what reckless is, or cleaning this gun in a school room of first graders. That is reckless. *** That is what involuntary manslaughter is all about, the closest class of felony that is—.

MS. SIEGAL: Objection, Judge.

THE COURT: I would sustain the objection, and ask the jury to disregard it.

\* \* \*

PROSECUTOR: You saw this man testify. *** Did he show one iota of remorse. Did he say he was sorry. *** Did he say oh, my God, I will never be able to—.

MS. SIEGAL: Objection, Judge.

THE COURT: I will sustain the objection, and I will ask the jury to disregard it.

\* \* \*

PROSECUTOR: *** There is only a limited number of defenses that are available in this criminal trial. ***

\* \* \*

One defense that was available was accident. In order for you to be able to determine it was accident—.

MS. SIEGAL: Objection.

THE COURT: I will sustain the objection.

MS. SIEGAL: And ask the jury to disregard it.

THE COURT: The defense is not contending that it was an accident.

PROSECUTOR: *** [S]ome evening there may be a knock on the door and there may be a policeman there, and he may be telling you that some such person was shot and killed, and you will be overcome by grief *** and- the police will say to you, yes, we got the guy, *** and yes [the victim] was shot in the back, but he said it was an accident—.

MS. SIEGAL: Objection.

PROSECUTOR: So we let him go.

THE COURT: I will sustain the objection.

PROSECUTOR: He says he did.it reckless—.

MS. SIEGAL: Objection, Judge.

THE COURT: This line of argument is out of kilter. I will sustain the objection. I ask that you move on.

\* \* \*

MS. SIEGAL: I ask that the jury be instructed to disregard that line of argument, please.

THE COURT: They will be so directed ***.''

After the jury retired to deliberate, one of defendant's attorneys moved for a mistrial, based on what he characterized as the extremely prejudicial closing argument of the prosecutor. In response, the trial judge noted that he had both sustained defense counsel's appropriate objections and directed the jury to disregard certain of the prosecutor's remarks. He further stated that while he did not condone these remarks, he did not believe that they were cause to declare a mistrial.

Subsequently, during the course of their deliberations, the jury tendered a note requesting "testimony regarding the results of the gun residue tests, regards to [sic] levels of residue found on both hands of Mr. Alvarez." The court advised the jury that the court reporter's notes were not available and referred them "to their collective memories" as to the testimony of all the witnesses, in terms of "what they did or saw or what the test results were."

Following the jury's verdict, defendant's written post-trial motion, raising eight allegations of error, was denied. At defendant's sentencing hearing, decedent's sister, Elena Vieyra, was called as a witness in aggravation. She testified that in January 1985, her brother was employed as an upholsterer and had a three-week-old daughter. She further stated that he was also survived by both parents and four other siblings. After hearing further testimony in aggravation and in mitigation, and having stated that he had reviewed defendant's presentence investigation report, the trial judge sentenced defendant to a term of 38 years in the Department of Corrections.

OPINION

■■ ■ We first address defendant's contention that his conviction should be set aside because the State failed to prove venue as charged in the indictment. He argues that the record contains no testimony or stipulation that the offense occurred in "Cook County, Illinois." As defendant correctly observes, the charge that a crime was committed in a particular county is a material element in the State's case and must be proved beyond a reasonable doubt in order to sustain a conviction. (*People v. Allen* (1952), 413 Ill. 69, 107 N.E.2d 826; *People v. Hanson* (1985), 138 Ill. App. 3d 530, 485 N.E.2d 1144; *People v. White* (1975), 26 Ill. App. 3d 659, 325 N.E.2d 313.) However, like any other fact in a criminal case, the venue of an offense may be proved by circumstantial as well as by direct evidence. (*Allen*, 413 Ill. at 76, 107 N.E.2d at 830.) It has been held that certain factors in evidence, such as the testimony of Chicago police personnel, and the descriptions of street locations and street names, are sufficient to establish

venue by circumstantial evidence. (See *People v. Kucala* (1972), 7 Ill. App. 3d 1029, 1034, 288 N.E.2d 622, 625; *People v. Washington* (1966), 81 Ill. App. 2d 90, 102-03, 225 N.E.2d 472, 479, *aff'd* (1968), 41 Ill. 2d 16, 241 N.E.2d 425.) Testimony of the participation of county officials, such as the Cook County medical examiner, in the investigation of the crime and the collection of physical evidence may be additional circumstantial evidence of venue. *Allen*, 413 Ill. at 77, 107 N.E.2d at 830; *Hanson*, 138 Ill. App. 3d at 539, 485 N.E.2d at 1150.

■ All of the above factors are present in the case at bar. Nearly every witness described the precise location of the crime either by reference to the street name and number or the street intersection. Sergeant Mulligan testified that 2309 South Wood Street, the exact location at which decedent's body was found, was within the Chicago police department's 10th District. Both the forensic pathologist who performed the autopsy and the toxicologist who tested blood samples taken from decedent testified that they were employed by the office of the medical examiner of Cook County. Moreover, *People v. White* (1975), 26 Ill. App. 3d 659, 325 N.E.2d 313, upon which defendant relies, may be readily distinguished. In *White*, there apparently was no evidence whatsoever as to a specific street address where the crime allegedly occurred. While one Area 4 Chicago police officer testified that she observed the victim's bruises at the University of Illinois Hospital two days after the occurrence, this court held that the officer's testimony had "no relation to the location of the alleged crime itself." It was therefore insufficient evidence from which the court could infer that the crime occurred within the venue of Chicago, Cook County, Illinois. (*White*, 26 Ill. App. 3d at 661, 325 N.E.2d at 315.) For all of the above reasons, we hold that there was ample evidence from which the trial court could infer that the crime was committed within the jurisdiction where the prosecution took place. (See *People v. Hanson*, 138 Ill. App. 3d at 538, 485 N.E.2d at 1150.) The State in this case met its burden of proving venue beyond a reasonable doubt.

Defendant next contends that, by withholding important discovery documents until the time of trial, the State violated both Supreme Court Rule 412 (107 Ill. 2d R. 412) and his due process right to the disclosure of evidence which is material to the guilt or innocence of an accused. (U.S. Const., amends. V, XIV; *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) The defense motion for a mistrial asserted the State's failure to tender three documents: (1) Officer McKeough's report; (2) the worksheet indicating the results of the laser examination of the closed knife found two feet under the

driver's side of the Cutlass; and (3) the diagram drawn by eyewitness Galarza while being questioned by police. The diagram mentioned by Galarza during cross-examination is neither contained in, nor referred to, at any other place in the record, except for the prosecutor's comment that he knew of no such diagram and would check further with detectives assigned to the case. Apparently, if this document existed, it was neither located nor produced.

Officer McKeough's report lists the physical evidence found at the crime scene, including "(1) folding pocket knife w/brown handle approx[imately] 11 [inches] *** (*** to be examined by Micro & Laser)." It further states that McKeough and another officer were met at the scene by detectives and by "Ptl. Krupa, Star No. 12826, Beat 1012, who related that [the] victim was shot during an altercation" as the victim and two women companions attempted to enter their Oldsmobile. It further states that the folding pocketknife was found under the victim's car. The worksheet, entitled "Receipt for Exhibits/Laboratory Division/Chicago Police," indicates that on January 25, 1985, three tests were performed on the knife, one of which was a laser test. The handwritten designation "neg," next to the name of each test, further indicates that the results of all three tests were negative. It is undisputed that one of defendant's attorneys, while she may not have seen McKeough's report prior to that time, was permitted to examine the prosecutor's copy of his report on the day of jury selection, before any witnesses were called. It is unclear at what point defense counsel had knowledge of the knife from photos taken at the crime scene. At least one of these photos, contained in the record, clearly depicts the knife as found by police, underneath the Oldsmobile.

■ ■ In *Brady v. Maryland,* the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97.) In subsequent cases, the Supreme Court delineated the standard for determining whether undisclosed evidence is "material" in the *Brady* context. In *United States v. Agurs,* it stated:

"A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.

* * *

*** [T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient signifi-

cance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976), 427 U.S. 97, 104, 108, 49 L. Ed. 2d 342, 350, 352, 96 S. Ct. 2392, 2398, 2400.)

In *United States v. Bagley*, the Court held that regardless of whether there has been a general request for the undisclosed material, a specific request, or no request, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States v. Bagley* (1985), 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383.) Finally, in applying the materiality standard, the omission must be evaluated in the context of the entire record (*Agurs*, 427 U.S. at 112, 49 L. Ed. 2d at 355, 96 S. Ct. at 2402), and the reviewing court may consider any adverse effect the prosecution's nondisclosure might have had on the preparation or presentation of the defendant's case (*Bagley*, 473 U.S. at 683, 87 L. Ed. 2d at 494, 105 S. Ct. at 3384).

■ The Illinois courts have adopted the *Brady* rule. In addition, our supreme court rules specifically provide for the pretrial disclosure of such evidence. (*People v. Hoffman* (1965), 32 Ill. 2d 96, 99-100, 203 N.E.2d 873, 875; 107 Ill. 2d Rules 412, 413; see also *People v. Keith* (1978), 66 Ill. App. 3d 93, 96, 383 N.E.2d 655, 658.) Supreme Court Rule 412 states in pertinent part:

"(a) *** [T]he State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

 * * *

(iv) any reports or statements of experts, *** including results of *** scientific tests, experiments, or comparisons ***[.]

 * * *

(c) *** [T]he State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce his punishment therefor.

(d) The State shall perform its obligations under this rule as soon as practicable following the filing of a motion by defense counsel." 107 Ill. 2d Rules 412(a)(iv), (c), (d).

It is undisputed that defendant's trial counsel, on March 6, 1985, more than one year prior to the proceedings now under review, filed a discovery motion requesting the State to disclose and produce, *inter alia*, a list of potential witnesses and "any written or recorded state-

ments by these witnesses, including those *** of police officers," as well as "a list of all physical property in the possession of law enforcement officials" and "reports made by law enforcement authorities pertaining to this property, including scientific reports." The record further reveals that the State, just prior to *voir dire* on April 21, 1986, sought leave of the court to amend its discovery answer, filed on July 2, 1985, to include the names of six additional witnesses, including Dr. Scala-Barnett, Jean Goliak, Officer McKeough, and three other persons who did not testify. In seeking this amendment, the assistant State's Attorney explained that these were names which had appeared in the police reports tendered in discovery on prior dates, that their omission was a "bookkeeping matter," and that he had previously discussed their addition with defense counsel. After defendant's attorney stated that she had no objection, the amendment was allowed.

■ It is well established that violations of the pretrial discovery requirements of Illinois Supreme Court Rule 412 are governed by the same standard as Federal due process claims decided under *Brady* and its progeny. (*People v. Lann* (1990), 194 Ill. App. 3d 623, 632, 551 N.E.2d 276, 282; *People v. Curry* (1988), 167 Ill. App. 3d 146, 152, 520 N.E.2d 984, 988; *People v. Bouska* (1983), 118 Ill. App. 3d 595, 599-600, 455 N.E.2d 257, 260-61.) Therefore, a new trial is not warranted in this case unless the requested materials, undisclosed until just prior to trial or during trial, were "material" in a constitutional sense, *i.e.*, unless there was a reasonable probability that their timely disclosure to the defense would have affected the jury's verdict.

■ Given the overwhelming nature and amount of the evidence supporting defendant's guilt, we cannot say that there was a reasonable probability that, had any or all of the items in question been tendered to defendant well in advance of trial, and utilized fully in planning and implementing a defense strategy, the result of the proceeding would have been different. Galarza's diagram of the crime scene, if such was indeed known and available to the police or the prosecution, could not have affected the jury's verdict. Galarza's testimony was that the diagram indicated with "X" 's where he was standing, where his truck was, and where the Oldsmobile and Cadillac were at the time of the shooting, but did not indicate any distances in feet. At trial, Galarza stated these same facts in detail, indicating distances in feet, and also marked a State's exhibit with "X" 's to clarify these locations for the trier of fact. Considering that his testimony was corroborated by other eyewitnesses, the substantive evidence represented by the diagram would have been merely cumulative. Its pos-

sible value for impeachment purposes was minimal at best. Likewise, the laboratory worksheet indicated that no latent fingerprints or other physical evidence was found on the closed knife located two feet under Vieyra's car. The worksheet was thus neutral evidence, unsupportive of either a voluntary or an involuntary manslaughter theory; it could not have affected the verdict. See *People v. Penland* (1978), 64 Ill. App. 3d 656, 661, 381 N.E.2d 840, 843.

Finally, Officer McKeough's report, when compared with the police photograph apparently made available to defense counsel at some point prior to trial, adds no new information about the knife except its approximate length in inches and that it was to be tested as indicated on the worksheet. While the report does mention that Patrolman Krupa, whose name nowhere appears in the State's discovery answer or its amendment to that answer, related that the victim was shot during "an altercation," the trial testimony of the eyewitnesses, of Sergeant Mulligan, and of the defendant conclusively established that there was no altercation, in the sense of an argument or fight, at the scene of the shooting. Trial testimony also established that there was no prior altercation or argument involving defendant and Vieyra. Moreover, defense counsel apparently knew of the knife before Galarza, Quezada, and Yolanda Garcia took the stand, and could have questioned those witnesses about Vieyra's possession or use of a knife on the night of the incident. Given the total absence of any evidence linking Vieyra with the closed knife found under the Cutlass, which was parked in a factory shipping and receiving area, we cannot say that the nondisclosure of McKeough's name as a potential witness, and his report, until the first day of trial, undermines this court's confidence in the jury's verdict. While the State has a continuing obligation to comply with Rule 412 and to disclose the identity of a witness and his written statements as soon as the intent is formed to call that witness or utilize his statements (107 Ill. 2d R. 415(b); *People v. Manley* (1974), 19 Ill. App. 3d 365, 371, 311 N.E.2d 593, 598), any nondisclosure of the documents here at issue would not warrant a new trial. We therefore hold that the trial court properly denied defendant's motion for a mistrial based on asserted discovery violations.

Defendant next contends that a voluntary manslaughter instruction should have been given because there was some evidence that he acted with a subjective but unreasonable belief in the need for self-defense force. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b).) He maintains that the jury could have concluded from his testimony that, at the time he fired the fatal shot, he genuinely believed that Vieyra was reaching for a weapon, and that because the car he was in was mov-

ing so slowly, he had to do something to protect himself, either by scaring Vieyra or by the use of force in self-defense. As previously noted, one of defendant's attorneys explained at the jury instructions conference that she was not tendering any self-defense or voluntary manslaughter instructions as a result of the court's prior ruling, disallowing an amendment to defendant's discovery answer. The trial judge responded that in his judgment, there was no issue of self-defense in the case. He observed that the decedent's back was to the shooter and neither the defendant nor any eyewitness testified to a conversation between the two men. For these reasons, he "would not have given the self-defense [instruction] in any event." Defendant now argues that the court erred in applying the law and that he was denied a fair trial by instructions that "fundamentally limited the jury's options in deciding the case on the evidence." *People v. Robinson* (1987), 163 Ill. App. 3d 754, 777, 516 N.E.2d 1292, 1309.

■■ Initially, we must address the State's claim that defendant has waived this issue on appeal. The State correctly observes that defendant's written post-trial motion framed the issue in terms of the court's failure to permit amendment of his discovery answer to include the affirmative defense of self-defense, rather than specifically alleging that the court erred in not giving a voluntary manslaughter instruction. The well-settled general rules are that issues not raised both during trial and in post-trial motion are effectively waived for purposes of review (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130), and that a party may not raise on appeal the court's failure to give a jury instruction unless he tendered the instruction at trial (*People v. Huckstead* (1982), 91 Ill. 2d 536, 543, 440 N.E.2d 1248, 1251). However, it is apparent from the record in this case that both the court and the parties recognized throughout the proceedings the interrelation of the court's refusal to allow the discovery amendment during trial and defendant's subsequent decision not to submit a voluntary manslaughter instruction. Moreover, we find it significant that, during the hearing on defendant's post-trial motion, and in response to that motion, the trial judge addressed at length his failure to instruct the jury on either of "the two provisions of voluntary manslaughter." He reiterated his view that, where no words were spoken, the victim was shot with his back to defendant, and defendant indicated that he was not in fear of his life, neither of the voluntary manslaughter provisions was involved, and that he had properly instructed the jury by giving them murder and involuntary manslaughter instructions. (See Ill. Rev. Stat. 1985, ch. 38, pars. 9—2(a) (voluntary manslaughter based on sudden and intense passion un-

der provocation), 9—2(b) (voluntary manslaughter based on unreasonable belief in the need for deadly force).) Accordingly, we conclude from our review of the record that, under these circumstances, defendant has not waived the issue on appeal, either by failing to submit a voluntary manslaughter instruction as a formal matter, or by framing the issue in a more general context in his motion for a new trial.

Nonetheless, we must agree with the State that the trial judge properly declined to instruct the jury on voluntary manslaughter. An individual commits voluntary manslaughter when he intentionally or knowingly kills another while acting under an unreasonable belief that deadly force is necessary to protect himself or another from imminent death or great bodily harm. (*People v. Jordan* (1985), 130 Ill. App. 3d 810, 812, 474 N.E.2d 1283, 1286.) It is well established that a self-defense and a voluntary manslaughter instruction should be given when any evidence is presented showing the defendant's subjective belief that use of force was necessary. If the subjective belief is reasonable, the result is justifiable use of force; if the subjective belief is unreasonable, the result is voluntary manslaughter. The determination of whether a defendant's belief was reasonable is to be made by the jury. (*People v. Lockett* (1980), 82 Ill. 2d 546, 552, 413 N.E.2d 378, 381; *People v. Joyner* (1972), 50 Ill. 2d 302, 306-07, 278 N.E.2d 756, 759.) Even a slight amount of evidence will raise the issue and justify the instruction. (*People v. Robinson* (1987), 163 Ill. App. 3d 754, 777, 516 N.E.2d 1292, 1298.) However, while a defendant is entitled to the benefit of any defense shown by the evidence, there is a minimum standard to be met before instructions are required. A defendant is not permitted unlimited instructions relating to possible theories of defense which are unrelated to the case and are based upon a mere factual reference or witness' comment. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540-41, 349 N.E.2d 31, 34; *People v. Rutkowski* (1986), 141 Ill. App. 3d 713, 716-17, 490 N.E.2d 1034, 1036.) Furthermore, our supreme court has consistently held that a refusal to give an instruction will not justify a reversal when the evidence in support of conviction is so clear and convincing that the jury's verdict would not have been different if the instruction had been given. *People v. Austin* (1989), 133 Ill. 2d 118, 124, 549 N.E.2d 331, 333; *People v. Moore* (1983), 95 Ill. 2d 404, 410, 447 N.E.2d 1327, 1330.

Our research reveals no Illinois appellate case where the nature and amount of evidence presented by defendant has been ruled sufficient to require a voluntary manslaughter instruction, or where a new trial has been ordered on that basis under equivalent circumstances.

In every case that we have examined, where a voluntary manslaughter instruction based on unreasonable belief has been warranted, there was at least some evidence before the jury that the fatal injury occurred in the context of an altercation or struggle, angry or derogatory remarks, prior or contemporaneous threats, a verbal dispute, frightening circumstances, a warning to defendant that the victim posed some apparent danger, an indication that the victim had some sort of weapon, or a combination of these factors. See, *e.g.*, *People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756 (voluntary manslaughter instruction required where defendant's gun discharged several times, killing one victim, during altercation following decedents' use of profanity and racial comments upon exiting their car and approaching defendant's vehicle, demanding that he move it); *People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378 (where defendant testified that 79-year-old victim, pulling a pushcart filled with glass bottles alongside car in which defendant and two friends were riding, and with whom the defendant and friends argued over blockage of the road, stated that he had something in the cart which would "make them move," and then reached into the cart and pulled up "something brown," while one of defendant's friends warned him to "watch out," there was sufficient evidence to support self-defense and voluntary manslaughter instructions, although police found only empty whiskey bottle at victim's side after defendant shot "at the man," in the stated belief that he had a gun); *People v. Everette* (1989), 187 Ill. App. 3d 1063, 543 N.E.2d 1040 (where defendant testified that victim, who had struck his head with a bottle five months earlier, and later had circled him with a gallon wine container in his hand, had on night of shooting tried to go through his pockets with two other men as he walked toward his apartment after retrieving his mail, was later observed with his arm in a striking position holding a can or other object, while one of the two other men said, "Hit him, hit him," and that defendant, "frightened," then pulled out his pistol and pointed it in the direction of victim to "scare him," and in stepping back caused the gun to hit mailboxes and fire into victim's back, the trial court's refusal to give self-defense and voluntary manslaughter instructions was reversible error); *People v. Mocaby* (1990), 194 Ill. App. 3d 441, 551 N.E.2d 673 (where defendant, prosecuted for murder in the stabbing of his adult son, while intoxicated, during an altercation on a family fishing trip, testified that he believed he needed to help his daughter, who was being pushed and shoved by the victim, a large man who on previous occasions had threatened to break defendant's neck, but had not intended to hurt the victim, a voluntary manslaugh-

ter instruction should have been given).

In contrast to the above-cited cases, the court determined in *People v. Rutkowski* (1986), 141 Ill. App. 3d 713, 490 N.E.2d 1034, that voluntary manslaughter instructions were properly refused. Rutkowski shot and killed a foreman during a meeting at work where his two-day suspension was being discussed. Eyewitness testimony revealed that defendant, the victim, and other supervisors sat in a business office and calmly discussed the disciplinary problem for 20 minutes, and that the victim neither shouted at defendant nor threatened him in any way during this time. The victim also had nothing in his hands. Defendant then stood up, told the victim that this would be the last time that he saw him, and produced a revolver from his pocket, shooting the victim four times. Defendant testified that he had been having problems with the victim at work, and that the victim had previously made accusations against him and called him derogatory names. He further stated that he had been suspended and sent home an hour earlier, but had returned to work with his gun, after drinking. Defendant recalled that during the meeting, the victim jumped up, and that his eyes "looked like he wanted to jump on" defendant. Then defendant's hand, like a spring, reached into his pocket and took out the gun, which he remembers pointing. After that, defendant's next memory was that of being fingerprinted at a police station. A psychologist later testified that defendant felt that the victim was "very threatening physically." The court concluded that "these vague, superficial comments by defendant [were] insufficient to give rise to a requirement that the tendered [voluntary manslaughter] instructions *** be given." (*Rutkowski*, 141 Ill. App. 3d at 716, 490 N.E.2d at 1036.) The court noted that where the victim was unarmed, and according to witnesses, not acting in any aggressive manner, defendant's perception and statements under these circumstances were insufficient to meet the minimum standard entitling him to the benefit of a defense "shown by the evidence." 141 Ill. App. 3d at 716, 490 N.E.2d at 1036.

We note that one recent case has held that a defendant was entitled to self-defense instructions, in addition to a second-degree murder instruction based on unreasonable belief,[2] where the victim was

---

[2]The offense of voluntary manslaughter has been replaced by the offense of second-degree murder (Pub. Act 84—1450, §2, eff. July 1, 1987). (See Ill. Rev. Stat. 1987, ch. 38, par. 9—2.) With the major exception of placing the burden on the defendant to prove the factor in mitigation, second-degree murder under the new statute is essentially the same offense as voluntary manslaughter. *Timberson*, 188 Ill. App. 3d at 177, 544 N.E.2d at 66.

shot in the back of the head and could not have been facing defendant when the pistol was fired and where defendant testified that he shot "to scare" the victim. (*People v. Timberson* (1989), 188 Ill. App. 3d 172, 544 N.E.2d 64.) However, *Timberson* may be distinguished from the case at bar in that the defendant and other eyewitnesses also testified that the victim had approached their group in a threatening manner, after shouting obscene remarks from a passing car, which had then stopped, and that the victim had reached into the waistband of his trousers, causing all of them to believe that he was reaching for a gun.

■■■ In our view, the facts as presented to the jury during the trial of Marco Alvarez fall somewhere between those of *Rutkowski* and *Timberson*, but do not include the additional factors of perceived threat and verbal harassment evident in the latter. Considering all of the circumstances, including defendant's position of safety behind the door of a mobile Cadillac with a passenger-side door which could not be opened, his lack of any communication with a victim who at no time approached him and was never seen with a weapon, and his statement that at the time he actually fired the fatal shot, hitting Vieyra in the back, he was unequivocally "not in danger," we cannot say that the trial judge abused his discretion by not instructing the jury on voluntary manslaughter and self-defense. Moreover, even if the trial judge had erred in this respect, such error would not be grounds for ordering a new trial in this case, where we believe that the evidence supporting defendant's murder conviction is so clear and convincing that the jury's verdict would not have been different even if they had been so instructed.

■■■ Defendant next contends that he was denied a fair trial by multiple instances of improper prosecutorial argument, including misstatements of the law and the evidence and appeals to the passions and prejudices of the jury. The State correctly points out that a prosecutor is allowed considerable leeway in making closing and rebuttal arguments and is entitled to argue the evidence and reasonable inferences drawn from that evidence. (*People v. Simms* (1988), 121 Ill. 2d 259, 269, 520 N.E.2d 308, 312; *People v. Albanese* (1984), 104 Ill. 2d 504, 520, 473 N.E.2d 1246, 1252.) This court has also held that it is entirely proper for a prosecutor to denounce a defendant's wickedness, engage in some degree of invective, and draw inferences unfavorable to the defendant if such inferences are based upon the evidence. (*People v. Bunting* (1982), 104 Ill. App. 3d 291, 296, 432 N.E.2d 950, 954.) In determining whether a prosecutor's closing comments are prejudicial, reference must be made to the context of the

language used, its relation to the evidence and the effect of the argument on the rights of the accused to a fair and impartial trial. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 445, 521 N.E.2d 38, 57.) However, " '[t]he character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge *** properly exercised the discretion vested in him.' " (*People v. Morgan* (1986), 112 Ill. 2d 111, 131, 492 N.E.2d 1303, 1310, quoting *People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324, 327.) There is a heavy burden of persuasion on a defendant seeking to reverse a conviction on the ground of improper prosecutorial remarks made during closing argument. A trial judge's decision to deny a motion for a new trial due to improper prosecutorial remarks made during closing argument will be reversed only if the remarks resulted in substantial prejudice to the defendant and if they " 'constituted a material factor in defendant's conviction, without which the jury might have reached a different result.' " (*People v. Lann* (1990), 194 Ill. App. 3d 623, 628, 551 N.E.2d 276, 280, quoting *People v. Thompkins* (1988), 121 Ill. 2d 401, 445, 521 N.E.2d 38, 57.) The dispositive question in the case at bar is whether the prosecutor's rebuttal argument resulted in substantial prejudice to defendant, constituting a material factor in his conviction without which the jury's verdict might have been different. In our opinion, there is no question that his remarks were, especially in combination, both highly improper and an abuse of prosecutorial discretion.

 First, we agree with defendant that the prosecutor's references to him as "a pro", who was "trained like a Mafia hit man," and never went anywhere without his "target gun," went beyond the evidence and beyond reasonable inferences therefrom. There is no testimony or other evidence whatsoever in the extensive trial record that defendant was a hired "hit man" or assassin, a professional criminal, had any ties with organized crime, or never went anywhere without a gun. His admitted military training in the use of rifles does not support an inference that he was "trained like a Mafia hit man." Nor did defense counsel ever state or imply that they agreed with the characterization of the shooting as an assassination or "hit." (See *People v. Franklin* (1990), 135 Ill. 2d 78, 100-01, 552 N.E.2d 743, 753.) Moreover, drawing an unwarranted connection between defendant and a disreputable and universally feared organized crime syndicate was highly improper and played upon the fears and prejudices of the jurors. For a prosecutor to refer to defendant as a professional criminal, or to suggest that the defendant's business or occupation is crime, has been held to be reversible error. (See, *e.g., People v. Ro-*

*mero* (1967), 36 Ill. 2d 315, 319-20, 223 N.E.2d 121, 123-24; *People v. Natoli* (1979), 70 Ill. App. 3d 131, 136, 387 N.E.2d 1096, 1100.) Here, the prosecutor further compounded his error in disregarding the trial court's efforts to cure the error by sustaining defense counsel's objection and directing the jury to disregard the argument that defendant was a "pro."

■■ The assistant State's Attorney also exceeded the bounds of proper argument by portraying the jurors and those they knew as potential victims of defendant Alvarez. His remarks clearly implied that someday, it might be they, the jurors, who would be shot in the back by defendant simply because they placed a hand into a pocket, or who would be overcome with grief because a loved one was shot in the back by defendant. While a prosecutor may dwell upon the evil of crime, and exhort the jury to fearlessly administer the law, he should refrain from making inflammatory appeals to the fears of the jury. (*People v. Crossno* (1981), 93 Ill. App. 3d 808, 824, 417 N.E.2d 827, 838.) Courts have repeatedly held that this type of commentary should be avoided. See, *e.g., People v. Frazier* (1982), 107 Ill. App. 3d 1096, 1102, 438 N.E.2d 623, 627 (improper to argue that jurors' "sisters, wives, [and] daughters" might be raped someday because they happened to be sitting next to someone like the defendant); *Crossno*, 93 Ill. App. 3d at 824, 417 N.E.2d at 838 (improper to argue to jury that "[t]omorrow, it may be your son or my son").

■■ ■■ Furthermore, it is elemental that counsel may not inform the jury of the severity of the sentence to which the accused is subject. (*Crossno*, 93 Ill. App. 3d at 823, 417 N.E.2d at 838.) In *Crossno*, the prosecutor stated in his rebuttal closing argument, "If you want to slap him on the wrist find him guilty of involuntary manslaughter." The appellate court held that this reference to a lesser included offense upon which the jury had been instructed was not only information which should not have been stated, but also misinformation, as the offense was punishable by up to five years' imprisonment. (*Crossno*, 93 Ill. App. 3d at 823-24, 417 N.E.2d at 838.) In the instant case, defendant claims that the prosecutor referred to involuntary manslaughter as "the lowest class of felony." The State maintains that we should look only to the words as they appear in the transcribed record, *i.e.,* "the closest class of felony." It appears that the words actually spoken are a matter of dispute between the parties, which we will not resolve. In either case, the assistant State's Attorney should not have referred to involuntary manslaughter as any "class of felony." The apparent purpose of his comment was to apprise the jury of the comparative severity of defendant's possible sen-

tences and to imply that an involuntary manslaughter verdict would result in negligible punishment for a professionally executed killing. However, while the attempted argument was improper and potentially prejudicial, it was attenuated by defense counsel's objection, which was immediately sustained by the court, with an instruction for the jury to disregard the comment. It is well settled that the trial court can correct an error by sustaining a timely objection and instructing the jury to disregard the comment. (*People v. Franklin* (1990), 135 Ill. 2d 78, 100, 552 N.E.2d 743, 753.) Under the circumstances, we conclude that the error was cured by the trial court's prompt corrective action and would not, in itself, constitute grounds for reversal.

■■ ■ Of greatest concern to this court are the prosecutor's remarks relating to "recklessness" and "accident." Taken as a whole, they reflect a calculated and persistent attempt to mislead the jury and to confuse their understanding of the legal theory underlying involuntary manslaughter. This line of argument had the greatest potential for prejudicing the defense and for denying the accused a fair trial because involuntary manslaughter was the only theory upon which the jury could have reduced the defendant's conduct to a lesser offense. As legal concepts, recklessness and accident are not synonymous. Recklessness requires a conscious awareness of a substantial risk of harm and a disregard of that risk. While an accident may result from negligence, mere negligence is not recklessness. (*People v. Santiago* (1982), 108 Ill. App. 3d 787, 802, 439 N.E.2d 984, 994.) Yet, as the State admits in its brief to this court, the words "reckless" and "accidental," as generally understood by the layperson, have almost interchangeable definitions. Based on the testimony and the physical evidence, there was no possibility that the jurors could have characterized defendant's pulling of the trigger as "accidental." Thus, an argument calculated to present the concept of "recklessness" as equivalent to "accident," thereby indirectly suggesting that the jury could logically eliminate both from serious consideration, had great potential for severe prejudice. A prosecutor is expected to show respect and due regard for defendant's constitutionally protected right to a fair trial. (*People v. Guyon* (1983), 117 Ill. App. 3d 522, 535, 453 N.E.2d 849, 861.) Such respect was not shown by the prosecutor in this case, and the error was compounded by his blatant disregard of the judge's instruction to end this line of argument and to move on.

■■ We strongly condemn this type of intransigent determination to make an improper and prejudicial argument which is calculated to mislead the jury by misstating the law as it applies to the

facts before them, irrespective of the court's rulings. It is well established that a prosecutor's misstatement of law in closing argument can be grounds for reversal. (*People v. Crossno* (1981), 93 Ill. App. 3d 808, 821, 417 N.E.2d 827, 836.) Moreover, our supreme court has specifically considered the prejudice to a defendant in a prosecutor's persistence in improper argument after an adverse ruling by the court. As the supreme court stated, "such persistence eliminates the salutary effect of the court's ruling in sustaining objections to the argument." (*People v. Weinstein* (1966), 35 Ill. 2d 467, 471, 220 N.E.2d 432, 434.) This court also reversed a murder defendant's conviction where a similar attempt was made to mislead the jury as to the proper consideration of accident as a defense, although in that case, accident was the primary defense theory and the trial judge had also erroneously refused an involuntary manslaughter instruction. See *People v. McCarroll* (1988), 168 Ill. App. 3d 1020, 1026, 523 N.E.2d 150, 154.

■■ However, notwithstanding the egregious and indefensible prosecutorial errors discussed above, we are nonetheless constrained to hold that, under the peculiar circumstances present in this case, defendant's conviction should not be reversed on this ground. We base our decision on the following factors, which, taken as a whole, convince this court that the prosecutor's comments did not, in actuality, constitute a material factor in defendant's conviction, without which the jury might have reached a different result. First, we note that both the nature and the amount of evidence supporting the jury's verdict was clear, convincing and overwhelming. Secondly, the jury were well instructed on involuntary manslaughter, including the legal definition of recklessness. Third, the trial judge promptly sustained nearly all of defendant's objections throughout the closing argument and clearly indicated to the jury that any discussion of "accident" was irrelevant and that defendant was not contending that the shooting was an accident. Fourth, the prosecutor's comments, despite their impropriety in other respects, included a detailed and accurate discussion of the legal concept of recklessness. Finally, and very significantly, the jury requested during their deliberations the transcribed testimony of the gun residue expert. Specifically, the jurors wished to examine her testimony concerning the levels of gun residue "found on both hands of Mr. Alvarez." This request evinces a concern on the part of the jurors as to whether defendant could have fired the revolver with his right hand alone, and with no left hand involvement, as he testified, or whether, conversely, the scientific evidence precluded that possibility. A specially equipped target gun, fired with

both hands of the shooter placed on the weapon, facilitating his use of the adjustable sight, could not have been fired recklessly. In other words, the record indicates that the jury had not confused "accident" with "recklessness" and were giving proper and diligent consideration to the involuntary manslaughter instruction in the context of the evidence. We therefore conclude, in light of all of these factors, that the jury's verdict in this case would not have been different in the absence of prosecutorial error. Accordingly, it will not be disturbed.

In so holding, we hasten to point out that the likelihood of a recurrence of the unique combination of factors which permits us to sustain defendant's conviction in this case is virtually nonexistent. Ordinarily, in the face of such calculated and highly improper conduct on the part of the State, defendant's right to a fair trial would be irreparably compromised and this court would be compelled to order a new trial. Justice and a proper regard for the integrity of the trial process demand no less, irrespective of the accused's guilt or innocence. Moreover, this court is again at a loss to ascertain why the State would engage in such tactics in cases such as this, where overwhelming evidence of defendant's guilt exists and is before the jury. In addition to its impropriety and prejudicial effect, this strategy risks wasting precious judicial resources and public funds in the course of an otherwise avoidable second trial, with a potentially different outcome, and, in all likelihood, another appeal. We take this opportunity to place the State on notice that we will not hesitate to order new trials in future cases where similar errors occur, as we have done in prior cases.

We now turn to defendant's claims of error relating to his sentencing hearing and the term of imprisonment imposed by the trial court. He first contends that he is entitled to a new sentencing hearing because Vieyra's sister improperly introduced "victim impact" testimony relating to Vieyra's surviving family members. In response, the State argues that defendant has waived this issue by failing to raise any objection to Elena Vieyra's testimony, either at or after the sentencing hearing. We agree. The Illinois Supreme Court has consistently held that a defendant's failure to object to evidence or arguments offered by the State at a defendant's sentencing hearing waives any objection thereto on appeal. (*People v. Britz* (1988), 123 Ill. 2d 446, 470, 528 N.E.2d 703, 715; *People v. Guest* (1986), 115 Ill. 2d 72, 108, 503 N.E.2d 255, 271.) Our review of the record reveals no defense objection at any time to Elena Vieyra's testimony. Moreover, even if the issue had not been waived, it would be merit-

less in light of recent Illinois cases addressing the admission of victim impact statements in noncapital cases. While the United States Supreme Court has held that the introduction of a victim impact statement at the sentencing phase of a capital murder trial violates the eighth amendment (U.S. Const., amend. VIII), the Court specifically limited its holding to capital cases. (*Booth v. Maryland* (1987), 482 U.S. 496, 507, 96 L. Ed. 2d 440, 451, 107 S. Ct. 2529, 2536.) Subsequently, the Illinois Supreme Court, following the reasoning of *Booth* that "[f]acts about the victim and family *** may be relevant in a noncapital criminal trial," has declined to extend the *Booth* principle to a noncapital sentencing hearing. (*People v. Felella* (1989), 131 Ill. 2d 525, 535-36, 546 N.E.2d 492, 496; *People v. Turner* (1989), 128 Ill. 2d 540, 578, 539 N.E.2d 1196, 1213.) Thus, admitting a victim impact statement into evidence at an Illinois noncapital sentencing hearing does not violate a defendant's constitutional rights. (*Turner*, 128 Ill. 2d at 578, 539 N.E.2d at 1213.) We further note that nearly all of Elena Vieyra's noninflammatory testimony relating to her brother's parents, other siblings, an infant daughter, and to his occupation, had already been presented at trial, by the same witness, without any objection by defendant. It is of course true that the witness, a sister of the decedent, is a "victim" as that term is defined in the Illinois Bill of Rights for Victims and Witnesses of Violent Crime Act, being "the spouse, parent, child or sibling of a person killed as a result of a violent crime perpetrated against the person killed." (Ill. Rev. Stat. 1985, ch. 38, par. 1403(a)(3).) While the Act accords a "victim" the right to present a "victim impact statement" at the sentencing hearing, and to offer evidence in aggravation or mitigation, both that statute and the Unified Code of Corrections contemplate that any statement or evidence offered in aggravation or mitigation will first be "prepared in writing in conjunction with the Office of the State's Attorney *** before it can be presented orally at the hearing." (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—4—1(a)(6), 1406.) There is nothing in the record establishing that Elena Vieyra's "victim impact" evidence, offered in aggravation, was first prepared in writing in conjunction with the State's Attorney's office, as required by statute. However, we find that any error in its admission was harmless under all of the circumstances. (See *Turner*, 128 Ill. 2d at 577-78, 539 N.E.2d at 1213.) Accordingly, for the above-stated reasons, a new sentencing hearing is not warranted.

Defendant's final contention is that the 38-year term of imprisonment imposed by the trial court was excessive and did not ade-

quately reflect his age and rehabilitative potential. He asks that we reduce his sentence to the minimum statutory term of 20 years. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(a).

It is well settled that sentencing decisions are entitled to great weight and deference, and provided that the sentence imposed is within statutory guidelines, reviewing courts may not reduce sentences absent a finding that the trial court abused its discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884; *People v. Hattery* (1989), 183 Ill. App. 3d 785, 828, 539 N.E.2d 368, 397.) Although we have the discretionary power to reduce an excessive sentence pursuant to Supreme Court Rule 615 (107 Ill. 2d R. 615(b)(4)), the supreme court has frequently stated that the trial judge is normally in a better position to consider and determine the appropriate punishment than the courts of review. (*Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.) The reasoned judgment of the trial judge depends on many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. (68 Ill. 2d at 154, 368 N.E.2d at 884.) In determining the appropriate sentence, the trial judge is to consider all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding. (*People v. Barrow* (1989), 133 Ill. 2d 226, 281, 549 N.E.2d 240, 265; *People v. Ward* (1986), 113 Ill. 2d 516, 527, 499 N.E.2d 422, 426.) While the Illinois Constitution requires that penalties shall be determined according to the seriousness of the offense and "with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, §11), rehabilitation is not the only factor which must be considered and does not outweigh other considerations which are persuasive of a severe sentence. (*People v. Watson* (1982), 107 Ill. App. 3d 691, 697, 438 N.E.2d 453, 458; *People v. Henderson* (1980), 83 Ill. App. 3d 854, 870, 404 N.E.2d 392, 404.) However, the record must indicate that the trial court considered both rehabilitative potential and the seriousness of the crime. *People v. Morando* (1988), 169 Ill. App. 3d 716, 726, 523 N.E.2d 1061, 1069.

Our review of the record in light of the above standards indicates no abuse of discretion in the trial court's sentencing decision. At the time of defendant's conviction and sentencing, the offense of murder was punishable by not less than 20 years and not more than 40 years.[3] (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(a).) In

---

[3]As of January 1, 1988, the maximum sentence for murder is 60 years (Pub. Act 85—902, eff. Jan. 1, 1988). Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(a).

sentencing defendant to 38 years, the trial judge stated that he had reviewed the presentence investigation report and had considered all factors in aggravation and mitigation. The presentence report reveals that defendant completed one year of high school, served in the United States Army, and had no previous convictions. However, it also lists defendant's employment history as one month's work as a construction laborer. The report further notes that defendant told the investigator that he had never had a good, steady job and that he had used cocaine almost every day for seven months prior to his incarceration. While the trial judge conceded that defendant's act in shooting the victim was "not an assassination in the sense that the State ha[d] argued," he noted that defendant nonetheless did "indicate a wilful and wanton disregard of human life," that a life had been squandered, and that the court would not deprecate the seriousness of that offense. The court also noted the dangerous combination of weapons and alcohol which played a role in defendant's behavior. Testimony had been offered that defendant was a good reader who had been admitted to a magnet high school for exceptionally talented students, which he had left after one year. In referring to this testimony, the court stated that defendant had chosen to squander his intellectual and physical talent. It is clearly evident from the record that the trial judge seriously considered and weighed the aggravating and mitigating factors, including rehabilitative potential, against the nature and seriousness of the crime, in reaching a decision as to an appropriate punishment. We find no abuse of discretion in this regard and decline to alter the sentence imposed by the trial court in this case.

For the above-stated reasons, we conclude that there was no reversible error in the conduct of defendant's trial and no abuse of judicial discretion. Defendant's conviction and sentence will be affirmed.

Affirmed.

LORENZ and MURRAY, JJ., concur.